ALFRED R. CROCKETT,

*vs.*

WILLIAM GREEN.

*New Castle, Sept. T. 1870.*

Upon an agreement which was written and signed by the defendant in the words following, viz: " I agree to sell to Alfred R. Crockett two acres "and 150 square perches of land, commencing 170 feet from the south side " of Green street, running parallel to Green street, with a front of one acre " on Broad street, at $1225." *Held* ,

1. That the agreement was too uncertain to be enforced by a decree for specific performance.

2. That the description of the premises sold, fails to satisfy the requirements of the Statute of Frauds.

3. That the land mentioned in the agreement, being parcel of other land of the defendant, and not capable of identification as a distinct and separate holding, the metes and bounds cannot be ascertained, without supplying the defect, by parol evidence, of something not referred to in the contract.

A deficiency in the memorandum as to the terms or subject-matter of the contract, cannot be supplied by any extraneous evidence, whether written or parol, unless the extraneous matter be referred to in the memorandum, so as, in legal effect, to be incorporated into it.

A defendant may fully admit a contract, resting wholly or partly in parol, as alleged, and, at the same time, avail himself of the Statute by insisting upon it.

Parol evidence is admissible, in aid of written contracts, only for the purpose of interpreting the meaning of words and phrases used in the writing, and not in any case to supply a deficiency of expression, and this restriction would seem to apply more stringently to cases in which the contract or instrument is one required, by the Statute of Frauds, to be in writing, than to those which may be good, without writing.

Parol evidence of the intention of parties cannot be admitted to give a construction to the words of a written instrument,—in no case to vary or control the sense of plain and unambiguous words, and not to explain doubtful or ambiguous words in those written instruments which are re-

quired, by statute or by the nature of the transaction, as the only evidence of the transaction.

A re-argument permitted after the opinion of the Court was read, but before decree entered.

BILL FOR THE SPECIFIC PERFORMANCE OF A CONTRACT IN WRITING FOR THE SALE OF LAND.—The memorandum was drawn and signed by the defendant, on the 30th of July, 1867, and is in these words :

"1 agree to sell to Alfred R. Crockett, two acres and 150 sq. perches of land, commencing 170 feet from the south side of Green street, running parallel to Green street, with a front of one acre on Broad street, at (*the rate*) *of $1225.00.

$$\left\{ \begin{array}{c} \text{U. S. REV.} \\ \text{STAMP} \\ \text{IOC.} \end{array} \right\}$$
 (Signed.) W. GREEN.

The bill alleged that the lot intended to be sold was one situated in Middletown, Delaware, and was more particularly described in a deed which the complainant, after the sale was made, caused to be prepared and tendered to the defendant for execution, together with $1225.00, the price stipulated, which deed the defendant refused to execute. The complainant tenders himself as still ready to pay the price, and prays a decree for specific performance.

The answer of the defendant, in substance, admits the allegations of the bill, but insists upon the insufficiency

---

*The words "*the rate*" were written in the original agreement, and then stricken out with a pen, leaving an awkward expression by inadvertence.

of the agreement under the Statute of Frauds, and claims the benefit of that Statute. The grounds of insufficiency alleged were, first, that the memorandum of the contract was not signed by both parties ; second, that it is uncertain in not designating the estate, in the premises, intended to be sold, and, third, that the description of the premises is not sufficiently certain and complete to locate them.

There was evidence adduced for the complainant, among other things, tending to identify the premises sold. It was proved that on the same day on which the contract was entered into, a surveyor, Joseph Roberts, in company with the parties, and with their assistance, surveyed the lines of the lot intended to be sold, locating it upon the east side of Broad street, 170 feet south of Green street, in Middletown. No plot was made, but the surveyor's field notes were proved in his deposition.

The lot formed part of a larger tract of land in Middletown, owned by the defendant, which he had laid off in squares and streets. Green street and Broad street were among these streets. There was also evidence of conversations between the parties at different times containing admissions tending to identify the lot sold:

*G. B. Rodney* and *J. H. Rodney*, for the complainant.

The construction given to the Statute of Frauds, requires signature of the contract only by the party sought to be charged. *Sugd. on Vend.*, 70, 94 ; *Jeremy's Equity*, 435 ; *Martin vs. Mitchell*, 2 *Jac. & Walk*, 418.

This case rests, mainly, upon the question whether the contract is good within the Statute of Frauds. The objection taken is, that the contract is too uncertain to admit of a decree for its execution. Our answer is two-fold:—

*First.* We claim that this contract is sufficiently certain. It locates the land with sufficient accuracy. By

its terms, the defendant is bound to convey the land on certain streets, assuming that they are in Middletown, and the complainant is entitled to a deed and may find the lot. The agreement is free from ambiguous terms, the doubt arises only when you attempt to locate. That doubt the complainant may take, if he choose. The statute prescribes no new element for contracts for sale of land which would not be necessary for other purposes, only that it be in writing; and that merely a "memorandum," not a formal technical instrument," and that the Court can act upon it.

*Secondly.* If it be not sufficiently certain, the parol evidence offered is not to set up a parol contract, not to add to a written one, but only to apply to the subject-matter the terms of a written one.

The answer admits seisin of the lot described in the contract. This is not an admission of a parol contract, but of the written contract, alleged, and as to the location of the land, mentioned. This is admissible, though the statute be pleaded. *Barry vs. Coombe,* 1 *Peters, S. C. R.,* 652; *Fish vs. Hubbard's Adms,* 21 *Wend.,* 653; *Ogilvie vs. Foljambe,* 3 *Mer.,* 61; *Stokes vs. Moore,* 1 *Cox C. C.,* 219; *Keiselbrack vs. Livingston,* 4 *Johns. Ch.,* 144; *Doe vs. Burt,* 1 *Term,* 701; *Gillespie vs. Moon,* 2 *Johns. Ch.,* 585; *Gerrish vs. Towne,* 3 *Gray,* 82; *Woods vs. Sawne,* 4 *Gray,* 322.

Parol evidence is admissible to explain, though not to contradict or vary. 1 *Gr. on Ev., secs.* 275, 288, 301; *Coutt's Trustees vs. Craig,* 2 *Hen. & Munf.,* 618; *Fonnereau vs. Poyntz,* 1 *Bros., C. C.,* 472; *Shelburne vs. Inchiquin,* 1 *Bro. C. C.,* 338; *Goodtitle vs. Southern,* 1 *M. & S.,* 299; *Brown vs. Thorndyke,* 15 *Pick.* 388; *Beach vs. Earl of Jersey,* 1 *Barn. & Ald.,* 550; *Baker vs. Seekright,* 1 *Hen. and Munf.,* 177; 2 *Evans' Pothier,* 184 &c.

The contract having been *written* and signed by defendant, his position is inequitable. He cannot object to uncertainty caused by himself. *Clermont vs. Tasburgh,* 1 *Jac. and Walk.,* 115 ; *Caldicot vs. Hodgson,* 2 *Vern.,*593 ; 1 *Chit. Gen. Prac.,* 838.

Parol evidence may be given of the construction placed upon the agreement by the acts of the parties, as in this case by the survey. *Cook vs. Booth, Cowp.,* 819 ; *Livingston vs. Ten Broeck,* 16 *Johns.,* 24 ; *Doyle vs. Teas,* 4 *Scam.,* 202. The rule applies which permits patent ambiguities to be explained. 3 *Ph. on Ev.* 1359, 1361, 1298-9, 1400 ; *Colpoys vs. Colpoys,* 1 *Jac.* 451.

*W. S. McCaulley,* for the defendant.

The policy of the Statute of Frauds is a beneficial one, and to be strictly enforced, more so under later decisions, contrary to the earlier ones. 1 *Wh. & Tud. L. Cas. in Eq.,* 745 ; *Throop on Verbal Agreements,* 76 *note.*

The allegation is of an agreement in writing, exclusive of any parol stipulation or feature. The proof must be confined to the allegation, otherwise we are surprised.

Independently of the statute, a written contract is conclusive of the intent of the parties. *Sugd. on Vend.,* 82 ; *Parteriche vs. Powlet,* 2 *Atk.,* 384. There is a distinction between contracts, executed and executory ; in the former, a construction must of necessity be admitted. 2 *Stark on Ev.,* (755.)

The attempt is, here, not to prove an independent fact, the effect of which is to identify the premises, but mere declarations of the defendant.

Where, as in this case, the instrument is so doubtful that something is needed to shew the meaning of the parties, it is a patent ambiguity not admitting of parol evidence. 3 *Ph., on Ev.* 1360 ; 2 *Wh. and Tud. L. Cas. in*

*Eq.*, 709 ; *Westlake vs. Westlake*, 4 *Barn and Ald.*, 57 ; 1 *Gr. on Ev., sec.* 300 ; *Brodie vs. St. Paul*, 1 *Ves. Jr.*, 333 ; *Powell vs. Edmunds*, 12 *East*, 6 ; *Parkhurst vs. Van Cortlandt*, 1 *Johns. Ch.*, 273 ; *Hammer vs. McEldowney*, 46 *Pa. St.*, 336 ; *Morris vs. Stephens*, 46 *Pa. St.*, 200 ; *Maguire vs. Stevens, Am. Law. Reg., Aug.*, 1870.

Viewing or surveying the lot was not a part performance. *Sugd. on Vend.*, 85. The contract must be certain on its face. *Goldsmith Eq.*, 80 ; 1 *Madd. Ch. Pr*, 540 ; *Worthington vs. Hylyer*, 4 *Mass.*, 204 ; *Abeel vs. Radcliff*, 13 *Johns.*, 300 ; *Clinan vs. Cooke*, 1 *Sch. and Lef.*, 22 ; *Boardman vs. Reed's Lessees*, 6 *Peters*, 345.

This contract is replete with uncertainties ; it mentions no place in which the streets are, nor which side of the street is the beginning, no courses and distances, nor how much front on Broad street, no date and no quantity of estate. Words of limitation are necessary in executory contracts as well as in executed ones. 6 *T. R.*, 352.

The jurisdiction involved is discretionary, and should be exercised only where the party claiming relief brings before the Court a contract, clear and free from doubt.

THE CHANCELLOR :—

This is certainly a case of great merit on the part of the complainant, and it would be doing exact justice between the parties to grant the prayer of the bill.

But the Statute of Frauds presents an insuperable bar. The written contract of sale relied upon, fails, in its description of the premises sold, to satisfy the requirements of the Statute. The defect is such as cannot be supplied by parol evidence, unless there had been a part performance ; and even the admission made by the answer of quite enough to ascertain and locate the premises,

cannot avail the complainant. A defendant, while admitting a contract to have been made as alleged, may plead the Statute none the less effectually, which has been done in this case. These are the general conclusions to which the investigation has led. Let us examine them more particularly. And, first, is the memorandum on its face sufficiently certain in its description of the premises to satisfy the Statute ? It would be almost impossible, nor can it be necessary, to review all the cases bearing upon this question. The rule to be extracted, from the unquestionable current of decisions, touching the decree of certainty required by this Statute, is very clearly and concisely expressed by C. J. Shaw ; " the contract, or memorandum," says that learned judge, " must express the substance of the contract, with reasonable certainty, *either by its own terms, or by reference, to some other deed, record, or other matter, from which it can be ascertained with like reasonable certainty.*" Atwood vs. Cobb, 16 *Pick.*, 230.

Technical precision or minute detail is not required, for such contracts are mostly drawn by unprofessional persons ; they are merely executory, and the Statute itself, in using the term " memorandum," must have contemplated such writings to be wholly informal. Nevertheless, the substance of the contract,—all that is necessary to enable the court to execute it, such as the subject–matter, the price, and all material stipulations essentially must appear, however informally ; either by the terms of the memorandum, or, as C. J. Shaw expresses it, " by reference to some other deed, record, or other matter." The principle material to be here more particularly stated is, that a deficiency in the memorandum as to the terms or subject–matter of the contract cannot be supplied by any extraneous evidence, whether written or parol, unless the extraneous matter be referred to in the memorandum itself, so as, in legal effect, to be incorporated into it. *Clinan vs. Cooke, Sch. & Lef.*, 22, a leading

case, affords an apt illustration of the principle. There Cooke had advertised certain premises to be leased *for three lives or thirty-one years*, with a reference for information to himself and one Meagher, his agent. The plaintiffs, the Clinans, seeing the advertisements, applied to Meagher and a memorandum of agreement for a release was signed. Through oversight the memorandum was defective in not stating the terms for which the lease was to be made. Lord Redesdale (*p.* 33) held, that parol evidence was inadmissible to connect the memorandum with the advertisement, so as to supply the deficiency, and that only by a reference in the memorandum itself could the two be connected, so as to render the advertisement admissible under the Statute to supply the term of the proposed lease. "If," he says, "the agreement had referred to the advertisement, I agree parol evidence might have been admitted to shew what was the thing (namely, the advertisement) so referred to; for then it would be an agreement to grant for so much time as was expressed in the advertisement, and then the identity of the advertisement might be proved by parol "evidence; but there is no reference whatever to the "advertisement in this agreement." The Massachusetts case before referred to, *Atwood vs. Cobb*, illustrates the application of the same principle where the reference in the memorandum was to matter *wholly parol*, and not to a collateral writing, like the advertisement in *Clinan vs. Cooke.* The contract in that case was for the sale of premises which the vendor had previously purchased from the vendee, and the agreement was to re-convey, not for a consideration specified in amount, but expressed thus : "In consideration of the same sum which I paid him for "the same, with interest from the time when I purchased "the same," &c. The Court held that the reference in the memorandum to the price which the vendor had paid for the premises in his purchase, opened the way for proof to shew what that price was, as the consideration for the

present sale. The principle now under consideration is
well supported by the authorities. The leading ones are
*Brodie vs. St. Paul*, 1 *Ves. Jr.*, 326 ; *Clinan vs. Cooke*, be-
fore cited, in which Lord Redesdale reviews all the prior
cases, which, therefore, need not be here cited, and a case,
*Blagden vs. Bradbear*, 12. *Ves.*, 470, following *Clinan vs.
Cooke*. There, Sir William Grant held that the receipt of
an auctioneer, being relied on as a memorandum within
the statute, but failing to express the price, the defect
could not be supplied from the conditions of sale, because
the receipt contained no reference to the conditions. "The
receipt," he says, in substantially the language afterwards
used by C. J. Shaw, "must contain in itself, or, by refer-
ence to something else, must shew what the agreement
is." Precisely the same construction has been given to
the Statute of Frauds in this country, as will be sufficiently
shewn by the Massachusetts case of *Atwood vs. Cobb*, 16
*Pick.* 230, and especially by *Parkhurst vs. Van Courtlandt*,
1 *Johns. Ch. Rep.*, 273, in which Chancellor Kent, upon a
full review of the cases prior to and after *Clinan vs. Cooke*,
and both in law and equity, holds it "as a settled
"principle, that if the Court cannot ascertain, with a
"reasonable certainty, the terms of the agreement, from
"the writing, or from some other paper to which it refers,
"the writing does not take the case out of the Statute."
The Chancellor's decree in this case was reviewed in the
Court of Errors, 14 *Johns. R.*, 15 ; but the reversal was
upon the ground that the memorandum in question, in
that case, was not intended as the contract of sale, but
only as a license to take possession preliminary to sale ;
that the contract of sale was wholly by parol, and was
admissible on the ground of part performance. The rule
announced by the Chancellor, as to what is a sufficient
memorandum under the Statute, was expressly recognized ·
by the Court of Errors.

We may now proceed, in view of what we have seen
the Statute requires, to examine the memorandum of this

Opinion:—this memorandum would have to be supplemented by evidence.

sale. It describes the property sold as "two acres and "one hundred and fifty square perches of land, commenc- "ing 170 feet from the south side of Green street, running "parallel to Green street, with a front of one acre on "Broad street." The first step toward locating the lot is to find Green street, and Broad street. The memorandum fails to tell us in what village, town or city, these streets are to be found. Also, on which side of Broad street the lot lies, yet according to the weight of authority, these omissions are fatal, as not matter of description. The terms 170 feet from the south side of Green street, on Broad street, are not so vague, indefinite or insensible, but that they may, with reasonable certainty, be applied to their subject—matters by proof that the defendant actually held land lying upon Broad street, south of Green street, in Middletown, where both the parties resided. Such proof is made under the ninth interrogatory. Evidence of this nature is considered as not supplementing the memoran- dum, but goes only to the fact that the vendor owned certain property answering the description given, and such proof being of independent facts, and not of state- ments of the parties, its admission is held not to contravene the policy of the Statute. To this extent many of the cases cited for the complainant sustain him. Such as *Ogilvie vs. Foljambe*, 3 *Mer.*, 42; where the contract being by letter, the property was described as " Mr. Ogilvie's house," connected with other references, showing that the house intended was the one Mr. Ogilvie then occupied. So, *Barry vs. Coombe*, 1 *Peters S. C. R.*, 652, where the contract was for "your one-half part E. B. wharf and premises," a description which was held to be reduced to sufficient certainty by proof that the vendor held a moiety of a wharf property situated upon the Eastern Branch, and that it was known as the Eastern Branch wharf property. So, *Gerrish vs. Towne*, 3 *Gray*, 86, where the contract was for "the wharf and flats occupied by Towne and Hardin, and owned by Francis

Head," without reference to any city or town. In these and other like cases, the description, though general, and not sufficient, as on its face, to locate the premises exactly, was held sufficient for a specific performance, if it might be reduced to reasonable certainty by extrinsic evidence of facts, touching the situation, use, occupation, or known designation of the property. Such evidence is held to construe or apply the terms of description used and not to supplement further terms. Where the terms used are too vague or insensible to be rendered certain by extrinsic facts, touching the property, so that something further must be incorporated to enable us to locate the premises, then the rule before stated applies that such additional matter cannot be introduced except by means of a reference to it in the memorandum itself.

And such, unfortunately, in this case, on another point. For after we have found Broad Street referred to, and also the place of beginning, viz; 170 feet from the south side of Green, on the east side of Broad, it will still remain to trace the boundaries of the two acres and one hundred and fifty square perches of the land. The testimony shews, the lot sold was previously held by Green, not as a separately bounded lot, but as parcel of a larger tract which he had laid off in squares and streets. What was intended to be sold could not be identified, as is usually done, by an actual separate holding of the premises under lines before established, but it remained yet to be carved out from the main tract which surrounded it, except on the street side, and it could be identified only by running new lines. For doing this the memorandum fixes the place of beginning, viz :—170 feet from Green street but nothing more; does not enable us to move another step. It gives neither the depth nor front. "A front of one acre " on Broad street," mentioned in the memorandum means nothing. Here, then, though we are at the place where the lot is to be located, the memorandum affords us no means by which to do it. If the Court should as it is

urged to do, locate this lot by means of the survey made
by Roberts on the day the contract was entered into, July
30th, 1857, in the presence of these parties, it will go
wholly outside of the written contract and find its subject-
matter, not by applying, through extrinsic facts, any terms
used in it, as it might do, but by evidence entirely ex-
traneous, and thus the Court will execute a contract
resting partly in writing and partly in parol. Parol
evidence can no more supply defects in an agreement
than supply the entire want of one: Sir Wm. Grant in
*Blagden vs. Bradbear*, 12 *Ves.*, 470 ; Chancellor Kent in
*Parkhurst vs. Van Cortlandt*, 1 *Johns. Ch. R.*, 281.

The fatal defect in this case is, that the lines were not
previously run and incorporated in the contract; or the
depth or front of the lot given, or if the metes and bounds
were to be ascertained by a subsequent survey, that some
reference was not made to such contemplated survey so
as to make its results a part of the contract, according to
the rule before referred to, as announced by C. J. Shaw,
Lord Redesdale, and Chancellor Kent.

I have read with care all the cases cited on this point
for the complainant. They are all distinguished from this
one by the fact that, in them, the property sold was held
by some previously established and known boundaries,
and that the terms of description used applies to the
premises as so held, such as "Mr. Ogilvie's House," being
his house and premises as then occupied, in *Ogilvie vs.
Foljambe*, 3 *Mer.*, 52 ; "a wharf and premises," in *Barry
vs. Combe*, 1 *Peters S. C. R.*, 652; "the wharf and flats
occupied by Towne and Hardin," in *Gerrish vs. Towne*, 3
*Gray*, 86 ; "a tract of land in Southborough known by the
name of the Mill Spot," in *Woods vs. Sawin*, 4 *Pick*, 322 ;
"a tenement, in the occupation of Hicks and Campbell,
which contains two stores, the small built house which Dr.
Cringan has his shop in, and a large lumber house, and
the lot of ground extending to Crouch's line," *Coutts'*

*Trustees vs Craig*, 2 *Hen. and Mun.* 618. In all these, and like cases, it will be observed that there was no question as to boundaries to be newly run, but the premises sold being previously held by known boundaries, the general identification of the premises sufficiently ascertained their boundaries. It was very much insisted that the survey of the lot on Broad Street, made on the same day on which the contract was entered into, and the subsequent declarations of the defendant tending to identity the lot, may be received as cotemporaneous acts, and admissions of the parties, explanatory of their under-standing and giving a construction to the contract. But the rule which admits acts of the parties (I do not find that it includes their declarations) to explain a contract, applies only for the purpose of construing doubtful or ambiguous terms, as the case cited well illustrate. For example, in *Cooke vs. Booth, Cowper*, 819, there was a lease for three lives, with a provision for its renewal upon the expiration of any one of the lives, and so from time to time, the renewals (as it was expressed) to be under the same rent, and *subject to the same covenants* contained in the original lease. There were several successive renewals executed under this clause, in all which there was inserted a like covenant for renewal. Finally, the lessor, upon the expiration of a life, and application for another renewal, refused to grant one containing the usual covenant for renewal, and the question was, whether the phrase in the original lease, "subject to the same covenants," included or excluded the covenant for renewal. This was a mere question of construction as to the meaning of a phrase in itself ambiguous, and the Court held proof admissible to shew how the parties themselves had construed this phrase, by inserting this covenant in all the prior renewals. So, in *Livingston vs. Ten Broeck*, 16 *Johns. Rep.*, 14, the case turned upon the construction to be given to a license contained in a deed "for cutting and hewing of timber for building or firewood." The question was, whether it

carried the right to cut for fences.   This right having been in fact, conceded and exercised for a series of years, so as to include fences.    This usage between the parties was admitted as their own construction of the terms used in granting the license.    In all this class of cases, acts of the parties are admitted as evidence only to construe ambiguous words or phrases used in the written instrument,—never to supply the use of terms, or stipulations, or matter of description inadvertently omitted.    That is the necessity here,—something by means of which to locate the boundaries of this lot, as to which the memorandum is a blank.    I pass now to two special grounds of relief.    One of these was the fact that the memorandum was written by the defendant, who, therefore, ought not, in equity, to be admitted to take advantage of its uncertainty.    The answer to this is, that the Court is restrained by the positive requirement of the Statute from dealing with these parties according to the equities of the particular case.    The Courts have, it is true, gone so far as to relieve against fraud arising out of part performance of a contract not in writing, but no further.    The controlling force of the Statute over all equities arising out of special circumstances, except in cases of part performance, appears in the rule now so well settled, (notwithstanding the doubts of Chancellor Kent in *Gillespie vs. Moore*, 2 *Johns. C. R.*, 585,) that the Court will not, for the purpose of decreeing a specific performance, reform a written contract in a case of omission through fraud or mistake.    This very familiar branch of its jurisdiction, the Court will not exercise when asked to do so for the purpose of a decree for specific performance, because that is held to contravene the policy of the Statute.    The authorities cited for the complainant, would not sustain a decree in his favor, upon the ground that the defendant wrote the contract.    The other special ground for relief insisted upon was, the defendant's admission by answer that the lot described in the deed tendered to him for execution, was the lot contracted for.    The

defendant's answer, frankly admits all that the bill alleges touching the meaning and object of the contract, and the identity of the lot sold. It insists upon the benefit of the Statute. Now it has long ceased to be a matter of controversy, that a defendant may fully admit the parol contract as alleged, and, at the same time, avail himself of the Statute by insisting upon it. Nor is this privilege limited, as was argued, to the case in which the contract admitted to have been made, rested wholly in parol. It applies as well where the admission respects a contract defectively reduced to writing, as to one not reduced to writing at all. There is no conceivable ground, nor any authority, for the distinction suggested.

I am, therefore, brought to the conclusion that the bill must be dismissed. The effect of the decree will be to work injustice in this particular case, but that is a less evil than to compromise the policy of a wise and beneficial law. I cannot do better than apply here the observations of an able writer, treating of this very statute. "Where," he says, "integrity is a victim to the "Statute, it suffers the consequences of its own neglect of "the means thereby provided for its security against "fraud, and of the rational maxim of law, *vigilantibus non* "*dormientibus leges subveniunt.* The principle of law and "government require that particular hardship, and cases "even of transient injustice, must be endured, rather than "that the standing policy of justice should be disturbed. " A law composed with the design of obstructing the facili- "ties for fraud, and removing the temptation to perjury, is "baffled in its general policy by a subjection to rules of a "fluctuating operation ; and the anxiety to take cases out " of the Statute is the source of the inconvenience which "has been reproachfully imputed to the Statute itself." *Roberts on Frauds*, 151.

Let a decree be entered dismissing the bill, but without allowing costs to the defendant. As he is brought

here in consequence of his own blunder in drawing the memorandum, I think it equitable that he pay, at least, his own costs.

UPON APPLICATION of complainant's solicitors, after the opinion of the Chancellor was read, but before decree and entered, the case was re-argued.

*J. H. Rodney,* for the complainant.

The expression "a front of one acre," means such a front as a square acre would make,—The term " front " being used antithetically to *back and sides,*—giving 208 9-12 feet.

This expression is not unmeaning. It is a phrase susceptible of a meaning which may be shewn by parol evidence. 1 *Gr. on Ev., Sec.* 295.

Now the evidence afforded by the Surveyor's notes of survey, under the discretion of the parties, affords a construction to this phrase in accordance with the above suggestion.

*Mc. Caulley,* for the defendant.

Mr. Rodney's construction introduces something not there, in order to give sense to a phrase which has no meaning. A phrase or expression which is without meaning, as applied to the subject-matter, *i. e.* a line, cannot receive a sense by extraneous evidence. It applies to an area, not a line. The attempt is to supply $280\frac{9}{12}$ feet on the front line. That is not in the contract by any expression, or by *necessary implication.* An acre may be of any shape. How is it assumed that the shape is to be rectangular with a front of one square acre ? Even with such a shape, the front is not fixed. How is it known

61

that Green had land sufficient to be included in the rectangle ?

The parol evidence relied on does not sustain the construction insisted upon, *i. e.*, a rectangle, with the front of a square acre.

*G. B. Rodney*, for the complainant—in reply.

1. In the language of surveying, "an acre of land" means an acre by square measure. Therefore, even without evidence, a "front of an acre" might be construed a front of a square acre.

2. Even were it not so, it is still open to shew what the parties meant by it—which is done by the survey directed by themselves. *Sugden on Vend. Ch.* 1, *Sec.* 4.

Besides, it may be shewn that the phrase has, by *local use*, the sense attributed to it.

If it be considered that the *local usage* of a word or phrase must be proved as a fact, and that, on that point, there is no evidence, the Chancellor may yet satisfy himself by ordinary proof, this being the only point of objection to relief.

THE CHANCELLOR :—

I have considered with care, and, so far as I can know myself, with candor, the views presented, upon 'the re-argument, by the complainant's counsel, of the point on which the opinion heretofore announced, rested, viz ; the failure of the written contract sufficiently to locate the bounds of the lot intended to be sold. The rule of law which has been applied to the case is not questioned, that is, that the description of the premises, like all the essentials of a contract, must, under the Statute of Frauds,

be ascertained *with reasonable* certainty, either by the language of the written contract, or by some writing or other matter referred to in it.

Parol evidence, to a considerable extent and variety, is admissible in aid of written contracts ; but it is admissible only for the purpose of interpreting the meaning of words or expressions used in the writing, and not, in any case, to supply a deficiency of expression. And this restriction would seem to apply more stringently to cases in which the contract, or instrument, is one required by statute to be in writing, than to those which may be good without writing.

Now the argument, conceding these principles, claims that there are, on this memorandum, expressions which, even if not sufficient, taken by themselves, are yet so explained by the evidence as to ascertain the boundaries of the lot. A "front of one acre," is an expression relied on as fixing the length of the front line ; the running parallel of Green street, applied to the lot as a whole, is supposed to ascertain its shape to be a paralellogram ; and thus the length of the front line and direction of the sides being found, the quantity sold, *i. e.*, one acre and 150 square perches, would locate the back line. The whole of this argument rests upon the assumption that "front of one acre" means a line of such length as equals one side of a square acre. Does it then appear,—not conjecturally,—not as an inference from the impossibility of giving any other sense to these words, but does it appear with that reasonable certainty which the policy of the Statute requires, that such is the sense of these words? Now, in answer to that question, we observe, first, that this phrase, "front of one acre," has no proper application to a line, and has not a natural or generally acknowledged and received sense, such as is here claimed for it. Again, although it is unquestionably true, that the words may have such a sense by usage, either local or

among surveyors, as a class, still such usage has not been proved, as it must be when relied on to interpret a written instrument; nor can the Court, as was suggested by the senior counsel for the complainant, now, after a hearing, admit evidence of usage, even were an application made, because no satisfactory reason could be assigned for the omission to take such proof at the proper stage of the cause. Then we are brought to the precise point chiefly relied on, viz : that the survey, which is in evidence, may be taken as a cotemporaneous exposition, by the parties, of the sense in which they used the terms "front of an " acre,"&c.

To give to the survey the effect here desired, would solve the difficulty, and, probably, effectuate the real purpose of the parties. But to do so, would violate a settled rule of law, viz: that parol evidence of the intention of parties in the particular transaction, cannot be admitted to give a construction to the words of a written instrument; in no case to vary or control the sense of plain and unambiguous words, and not to explain doubtful or ambiguous words in those written instruments which are required by statute or by the nature of the transaction, as the only evidence of the transaction. Let us examine this point, carefully.

*First*, it must be observed that the proposed use of this survey has no direct bearing upon the sense of these words, " front of an acre, " like the effect of the ordinary, recognized words of interpreting words by ascertaining in what sense they have been used, either locally, or in some act, science or trade to which they relate, or even by the parties themselves in prior transactions, so that having, by such means, ascertained the sense of the words, the Court can read in them the intention of the parties without any extrinsic proof of that intention. But the attempt is to reverse this, the legitimate mode of interpretation ; it is first to prove by the survey, as a part of

the *res gestae,* independently of any words in the contract, what land was intended to be sold, and then to construe the words in question, so as to give effect to that ascertained intention, so that instead of drawing the intention of the parties in the transaction from the sense of the written words, which was what the Statute sought to secure, the sense of the words is to be drawn from parol proof of the intention of the parties, which is, in effect, to establish the contract upon mere parol proof, the very mischief against which the Statute was designed. The effect, in this respect, is precisely the same, whether the intention is sought to be gathered from the acts, or from the declarations of the parties as to what they intended ; and yet, I apprehend, it was never attempted to construe the words of a written instrument, by proof of declarations or admissions by the parties, as to their real intention in the transaction.

Taking such to be the real effect of the survey as sought to be used, it is encountered by the rule that parol evidence of the actual intention of parties cannot control or influence the construction of written instruments.

In no case can such parol evidence contradict or vary the clear sense of written words ; whether they are admissible to explain a doubtful or ambiguous sense(which is the case with these words) may depend upon these circumstances. If the transaction to which the writing relates, be such as might be proved by parol, not being required to be in writing, parol proof of intention might be deemed admissible, merely to explain the sense of doubtful words, not contradicting the written evidence adopted by the parties, nor violating any statute prohibition against parol evidence of the transaction. It is only on this ground that the case of *Gray vs. Harper,* 1 Sto. *R.,* 594, and others like it, can stand, when under a contract for a purchase of a certain work at cost, a contract which might have been wholly by parol, conversations of

the parties were admitted to explain what sense they attached to the word " cost." *Spicer vs. Cooper*, 1 *G. and D.* 52, and *Selden vs. Williams*, 9 *Watts*, are cited as similar cases. 1 *Gr. on Ev.* § 281, *n* 5, *p.* 383, *n.* 1. But where, by statute or by the nature of the transaction, a written instrument is required, parol evidence of intention is wholly inadmissible, not only to contradict or vary, but equally inadmissible to explain or remove obscurity, or in any way to influence the construction of words. One exception only to this remark is stated by C. B. Abinger in *Doe vs. Hiscocks*, 5 *M. and W.* 367-8, where, speaking on this point, he says : " Now there is but one case in which it appears to us that this sort of evidence of intention can properly be admitted, and that is, where the meaning of the testator's words is neither ambiguous nor obscure, and where the devise is, on the face of it, perfect and intelligible, but from some of the circumstances admitted in proof, an ambiguity arises, as to which of the two things, or which of the two or more persons (each answering the words in the will) the testator intended to express.

Subject to the exception stated by C. B. Abinger, it is the rule that, where writing is required as evidence of intention, doubtful words in it cannot be solved by parol proof of the actual intention, 1 *Jarm. on Wills*, states this as a broad and clear rule in the case of wills ; excluding parol evidence either to " contradict, add to or explain " (*p.* 349.) or "for the purpose of controlling or influencing," (*p.* 358). It is supported by many authorities upon wills. An early one was *Strode vs. Lady Falkland*, 3 *Ch. Rep.*, 98, where the question being, whether the words of a devise "all other my lands, tenements and hereditaments "out of settlement" should include a reversion, it was unanimously agreed by Lord Chancellor Cowper, the Lord Chief Justice, and the Master of the Rolls, that evidence to prove the intention to include such reversion was inadmissible, "for that where a will was doubtful and

"uncertain, it must receive its construction from the "words of the will itself; and no parol proof or declara-"tion ought to be admitted out of the will to ascertain it." In a modern case, *Doe vs. Hiscocks,* before cited, in an elaborate opinion by C. B. Abinger, the same rule was held, excluding all parol proof of intention when, adduced, as he expresses it, "either to supply some deficiency, or "remove some obscurity, or to give some effect to ex-"pressions that are unmeaning or ambiguous." And he puts the broad exclusion upon the requirement that a will should be in writing. "It appears to us," he says, "that "in all other cases"(that is, except the one case before put of what Lord Bacon calls "an equivocation,") "parol "evidence of what was the intestate's intention, ought to "be excluded, upon the plain ground that his will ought "to be made in writing ; and if his intention cannot be made "to appear by the writing, explained by circtmstances, "there is no will." It need hardly be said that the same principles must apply to contracts for the sale of lands, since these, like wills, are required by statute to be in writing. They must, upon the like reason, apply to all cases in which, either by statute, or from the nature of the transaction, the written instrument is required ; as to wills, deeds, mortgages or contracts respecting lands.

It is not meant that words may not be construed or applied by means of extrinsic evidence ; but that such evidence must not be proof of intention in the particular transaction. The extrinsic evidence, admissible in aid of written instruments, is of certain, well-defined sorts, and may be reduced to two general classes, depending upon the object for which extrinsic evidence is needed. The object is two-fold. It may be to apply terms plain and unambiguous on their face to their subject-matter, or for the purpose of identifying the person or thing to which they relate. For such a purpose, considerable scope is allowed in proving the situation or qualities of the thing mentioned in the instrument, the fact that a party holds

certain property, and the manner of holding it, in the case
of a testator, the condition of the family and affairs, of
his property or business, and all the circumstances in
which a testator, or any party to an instrument, was placed.
2 *Phillips, on Ev.*, 292- 3. The other object for which
extrinsic evidence may be needed, is to interpret the
instrument on its face, the necessity arising out of the fact
that its language is foreign, or that terms are employed
which are doubtful, ambiguous or technical. In such cases,
the appropriate modes of interpretation are, such as
translations, if the language be foreign ; or proof of usage
to explain the sense of idiomatic or provincial expressions,
or ancient words, or terms of art, science or trade ; or it
may be proof of the manner in which the parties have, in
other like transactions, employed the same terms. It has
been the disposition of the courts in all well considered
cases, not to go beyond these appropriate and recognized
modes of interpreting and applying written instruments
A marked example of this is the case of Lady Hewley's
charities, *Atty. Gen. vs. Shore*, 11 *Sim.*, 592, in which
the admission of extrinsic evidence to assist written
instruments, was largely examined by the twelve Judges
of England, who were called to assist the House of Lords
in that case. Then the Judges refused to admit evidence
drawn from the known opinions of the founder of a
charity, upon subjects to which the charity related, to aid
in the construction of words defining the objects. The
devise was for the benefit of "poor and godly preachers
of Christ's Gospel." The question was whether these
words included Unitarians. Among other kinds of evi-
dence, the religious opinions of the testatrix as a trinitarian
were adduced. The Judges, though holding Unitarians
to be excluded, upon other considerations, excluded
evidence of her religious opinion to give a construc-
tion to the devise. C. J. Tindall and Baron Parke, whose
opinions were the leading ones, and are now received
as controlling authorities on the whole subject, both

adhere strictly to the modes before stated, of inter-
preting and applying written instruments.   Baron Parke,
after stating the two descriptions of extrinsic evidence
just referred to, adds (*p.* 626-7) that, "No extrinsic evidence
"of the intention of the party to the deed, from his
"declarations, whether at the time of his executing the
"instrument or before or after that time, is admissible,"
"*  *  The excepted cases in which such evidence is admis-
"sible, if, indeed, there be more than one excepted case,
"that is, where there are two subjects, or two objects,
"both described in the instrument, and each equally
"agreeing with it, having no bearing whatever on the
"present question."  This one excepted case, put by the
Baron, is the same stated by C. B. Abinger in *Doe vs.
Hiscocks*, before cited.   It is evident that Baron Parke, in
here stating the excluded evidence to be that of declara-
tions, puts them as only an illustration of the rule—as only
one of the excluded modes of proving intention by parol ;
for he afterwards says, that the sense of the terms, "poor
and godly preachers" must be ascertained from legitimate
sources, such as the usage of the words and the situation
and circumstances of the party, which he had before
explained, and adds, that the sense being so ascertained,
"no parol declaration of Lady Hewley, that she intended
"only a particular class or sect, or individuals with par-
"ticular opinions, would have been admissable ; nor could
"evidence of her conduct, character, habits or opinion,
"have been receivable to raise an inference of such
"intention."   C. J. Tindall, (*p.* 631-2,) after enumerating
the several admissible modes of interpreting instruments,
doubtful on their face, as by translations of a foreign
language, or proof of usage, or custom, as applied to
technical, ancient or idiomatic expressions, proceeds to
say ; "but while evidence is admissible in these instances
"for the purpose of making the written instrument speak
"for itself, which, without such evidence, would be a dead
"letter, or would use a doubtful tongue, or convey a

62

"false impression of the meaning of the party, *I conceive* " *the exception to be strictly limited to cases of the descrip-* " *tion above given, and to evidence of the nature above* "*detailed;* and that, in no case whatever, is it permitted " *to explain* the language of a deed by evidence of the " private views, the secret intentions, or the known princi- " ples of the party to the instrument, whether religious, " political or otherwise, any more than by express parol " declarations made by the party himself, which are uni- " versally excluded."

I must, in candor, confess myself unable to go with this decision to its full extent. It would seem that in the administration of a charity, which is rather an execu- tive, than a judicial act, where the object of such a charity is the propagation of certain doctrines or opinions, religious or otherwise, the opinions of the founder upon the subjects to which the charity relates, may be a legitimate subject of inquiry, without other restriction as to the sources of inquiry, than that they do not contradict the written evidence. On these more liberal principles, a religious charity of like nature, was dealt with in *Atty-Gen. vs. Pearson*, 3 *Mer.* 353, 7 *Sim.*, 290; and the like principle was applied to Lady Hewley's charity, by Lord Chancellor Lyndhurst, when the case was before him. 7 *Sim.* 309, *n.* But the opinions of the Judges in the House of Lords are useful for our purpose, because they establish a clear line of discrimination which, on the one hand, admits extrinsic evidence of that general nature which consists of facts connected with the subject-matter of the instrument, tending to identify the person or thing referred to, and necessary to apply language, plain on its face, to the subject-matter, and evidence which consists of translations or usage as means of interpreting language, not intelligible on its face, but, on the other hand, excludes all evidence not bearing directly on the words, and merely showing, independently of the words, what the parties in- tended in the particular transaction, whether such evidence

is drawn from the declarations, admissions, acts, or opinions of the parties, either cotemporaneous with, or subject to the transaction. That must be taken as the great principle which must be considered as established by this interesting case ; whether or not it was well applied to exclude evidence of the opinions of a founder, in aid of the administration of a charity, is not here material.

And now we may proceed a step further and inquire, how far this principle has been observed in those adjudged cases in which the attempt has been to construe written instruments by the acts of the parties, which is the kind of proof adduced in this case. The precise question has been much discussed in a class of cases arising under leases for lives, with a covenant for perpetual renewal. In these cases the question was, whether the covenant for renewal was to be construed so as to exclude or include in the new lease a like clause of renewal, and the attempt was to construe the covenant according to the acts of the parties under it. The first of these cases was one sent from chancery by Lord Bathurst for the opinion of the Court of King's Bench. *Cooke, vs. Booth, Cowp.*, 819. This was a lease for three lives with a covenant for renewal. There had been several successive renewals granted by the lessor, the new leases each containing a like clause for renewal as the first, but after the lessor's death, his devisee refused, upon the expiration of one of the lives, to grant a new lease with a like clause of renewal. The Court of King's Bench held him bound, upon the ground that the parties having four times successively renewed under it, had put their own construction upon it. This decision gave great dissatisfaction to the English equity judges. Lord Thurlow, who sat upon the return of the certificate in that case, disapproved of it, although feeling himself bound to decree in accordance with it. 3 *Ves. Jr.*, 298. Afterwards the principle of *Cooke vs. Booth* was condemned by Lord Alvanley in *Baynham vs. Guy's Hospital*, 3 *Ves. Jr.*, 295,

and in *Eaton vs. Lyon, ib,* 690; by Sir Wm. Grant in *Moore vs. Foley,* 6 *Ves. Jr.,* 231, *a*; and by Lord Eldon in *Iggulden vs. May,* 9 *Ves. Jr.* 325. In this latter case also, the opinion of the judges at law was taken upon the construction of a like covenant of renewal, first in the Kings Bench, 7 *East,* 237, and afterwards upon a writ of error in the Exchequer Chamber, 2 *N. R.,* 449. Both these courts, contrary to the case of *Cooke vs. Booth,* rejected evidence of the acts of the parties in prior renewals as construing the covenant in the original lease. In the King's Bench, Lord Ellenborough distinguishes the case from *Cooke vs. Booth,* upon the ground that it did not appear affirmatively from the pleading in the case before him, that the prior renewals had all included the clause for renewal, whereas, such did appear to have been the fact in *Cook vs. Booth.* But he refers to the principle of *Cook vs. Booth,* as being subject to "grave and serious doubts." In the Exchequer Chamber, however, *C. J. Mansfield,* delivering the opinion of the Court, wholly. repudiates the admissibility of this sort of evidence, and says of *Cook vs. Booth,* that it was "the first time that the acts of parties to a deed "were ever made use of in a court of law to assist the construction of that deed."

In another and later case in the Exchequer, *Maxwell vs. Ward* 13 *Price,* 674, the same view is said to have been strongly taken. (3 *Ves. Jr.* 299, *note* 2, 696, *note* 3). I have not been able to find the case. Sir Edward Sugden, upon a review of this course of decisions in 1 *Sugd on Vend. Ch. III, Sec.* 10, *par.* 14, concludes that " it appears "to be now clearly settled that in the *construction* of an "agreement or deed, the acts of the parties cannot be taken into consideration." A decision by the same learned author, as Chancellor of Ireland is cited by Greenleaf, (sec. 295 n.) From *Atty. Gen. vs. Drummond,* 1 *Dru. and War.,* 353, to the point that the acts of a founder of a charity may be shown in aid of the deed ; and there is also

cited *contra*, *Atty. Gen. vs. Glasgow College*, 10 *Jurist*, 676. These cases I have not been able to see.*

The editors of Sumner and Perkins' edition of Vesey Jr., in their notes to the cases before cited, which were before Lord Alvanly, Sir Wm. Grant and Lord Eldon, (3 *Ves. Jr.*, 294 ; 2 *Ib.*, 690 ; 6, *Ib.* 237 ;) have questioned the accuracy of the principles stated by those Judges, that

---

* The case of *Atty. Gen., vs. Drummond*, here referred to, will be found, upon examination, not to bear out fully the impression given by Greenleaf's citation of it, without respect to its subject-matter.

The deed there under construction was made by certain members of trinitarian dissenting congregations to etablish a trust for certain purposes, viz : first, to support the protestant dissenting interest against unreasonable prosecutions; secondly, to educate youth designed for the ministry amongst protestant dissenters; and thirdly, to assist poor protestant dissentmg congregations. The information was filed to prevent the application of any portion of the fund, in aid of the teachers of doctrines at varience with belief in the Trinity, and the case involved an inquiry into the construction of the deed with reference to the doctrinal character of the beneficiaries. The Lord Chancellor discussed, very much at length, the question, what kind of parol evidence was admissible to construe a deed.

In the course of the opinion, there occurs a passage which gives his con- clusion, and is probably the foundation of the citation in Greenleaf; " I reject, "therefore, at once, all evidence, which goes to show what the founders " thought, what their opinions were, in order to put a construction on this " deed; but I shall not exclude evidence which informs me what they did. I " shall receive evidence, which goes to show, to what places of worship they " resorted, or what their acts were, although this may not throw any light upon "the construction of the deed. I am clearly at liberty to receive such evidence, " because this deed proceeds upon certain existing foundations, which, it was "intended, should be continued and maintained for the future. I must, therefore, " inquire what were the foundations referred to by this deed, and I cannot do " so without knowing how far the founders were mixed up with these establish- "ments, not as to their individual opinions, but as to their acts, in forming a "part of the general body, whatever their opinions were, who resorted to these " foundations.

"Nobody will dispute, that I am entitled to evidence (indeed, I am " bound to know it without evidence) of the opinions professed by the general "body of Presbyterians. I am at perfect liberty, with evidence or without it,

the construction of a written instrument cannot be affected by the acts of the parties; without, however, any discus-sion of the subject by the editors, the doubt being rested only upon a reference to several American cases. One of these, *Stone vs. Clarke*, 1 *Metc.*, 378, together with *Choate vs. Burnham*, 7 *Pick.*, 274 ; and also, *Livingston vs. Ten Broeck*, 16 *Johns.*, 14, are the only American cases I have met with relevant to the question. In the New York case, in order to shew the extent of an equivocally expressed privilege to the grantee in it for cutting wood from other premises of the grantor, evidence was admitted of the subsequent acts of the parties in the exercise of the privi-lege ; but the admission of this evidence was based upon the antiquity of the deed, and the consideration that as, after so long a lapse of time, a general usage of such words could not be expected to be proved, the acts of the parties might be accepted as the next best evidence. In *Choate vs. Burnham*, the first of the Massachusetts cases, where the question concerned the extent of a right of way under a deed, the Court considered the language of the grant, of itself, conclusive, but remarked, generally, that, were it

---

"to resort to the "Westminster confession of faith," whether Presbyterians "subscribe it or not. If I find them in connection with the Synod of Ulster, "then I must inquire, what was the practice of that Synod, in matters of "religion, before I decide whether Unitarians are, or are not, included in the "trusts of this deed; I must know all about the foundations established before "the execution of this deed, to enable me to decide who come within the trusts "which it has created."

The case of Lady Hewley's charities, before referred to, was then pending in the House of Lords, and Sir Edw. Sugden declined to make a final decree in the case before him, until that case should be concluded. It will be observed, however, that the the views expressed by this distinguished judge and author, in this case, are, in no respect, antagonistic to the principles laid down by the Chancellor in the case reported in the text; and, with respect to the subject-matter of the case of *Atty. Gen. vs. Drummond*, they do not go further, if, indeed, so far as does the Chancellor in his observations upon the case of Lady Hewley's charities.

doubtful, acts of the parties which had been put in evidence might be accepted to aid the construction. *Stone vs. Clark* is the case which evidently prompted the notes in Vesey. But that case presented that kind of latent ambiguity referred to by C. B. Abinger and Baron Parke, as the one exception to the rule excluding evidence of intention. The question was, whether a mortgage of a large tract, included, also, a small lot lying with it, the terms of description being general and fully satisfied, either by excluding or including the lot. The words were perfectly intelligible on their face, but applicable equally well to two different subject-matters, and, therefore, consistently with the ruling of the English cases, the subsequent acts of the parties under it might determine the application of the words one way or the other. Upon this ground, alone, the case may be supported, though the language of Judge Wilde goes beyond it.

Upon the whole, the rule to be gathered seems to be that, where a written instrument is required by statute, or by the nature of the transaction, such as a will, deed or contract respecting lands, parol evidence of the intention of the parties in the transaction, whether shewn by declarations, or acts, at the time of, or after, the transaction, is inadmissible as well to explain or construe doubtful or insensible words, as to contradict plain and ambiguous words. The admission of such evidence opens a door to the uncertainties and dangers of parol testimony, which it is the very object of statutes, such as those of wills and of frauds, effectually to prevent. It is not surprising if courts, under the pressure of an inclination to give some construction to instruments of an executed character, under which the rights of parties are involved, one way or the other, such as wills and deed, should, sometimes, yield admission to strong evidence of intention, to construe doubtful words, especially in states where there is no equity jurisdiction for reforming instruments according to the intention of the parties. But we are free from any

such embarrassment. For as to executed instruments, we have an ample jurisdiction to reform them, and make them speak unequivocally the real intention, and in a case such as the present, in which the contract is executory and the parties remain in *statu quo*, there is no interest involved so serious as to sway the Court from maintaining the wholesome policy of the Statute of Frauds, by requiring a written contract, unaided by parol proof of mere intention, leaving the terms subject to what we have seen are the ordinary, recognized modes of interpretation.

The decree must, therefore, be entered as already directed.