EUSTIS MINING CO. v. BEER, SONDHEIMER & CO., Inc.

(District Court, S. D. New York. February 17, 1917.)

1. SALES ⬤⟾59—CONSTRUCTION—SEPARATE INSTRUMENTS.

A contract between the parties for the sale of a specified quantity of products, and a later agreement modifying the former with respect to the quantity of the products, must be read together, in so far as they can be reconciled; but, where they cannot be reconciled, the later must prevail.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 159.]

2. SALES ⬤⟾71(4)—CONSTRUCTION OF CONTRACTS—QUANTITY—MODIFICATION OF AGREEMENT.

A mining corporation and the owner of a smelter made a contract, whereby the former agreed to deliver to the latter the cinders produced from the ores it mined, not to exceed certain specified quantities each year, the lump and fine cinders to be in the same proportion as produced by the works burning the ore. A subsequent clause provided that it was the essence of the agreement that the mining company should ship cinders within the tonnage as specified as a first agreement, but should not be required to ship them from such a distance as would leave less than a stated profit per ton, and could sell its ore at such distances as to make shipment unprofitable, if it maintained at all times a supply sufficient to sell to burners from whom the cinders could be shipped to the smelter. Another clause provided that, if the mining company was unable to sell to the burners enough ore to produce the specified tonnage, it should be obliged to·ship only such cinders as were produced from ores actually sold. Subsequently the contract was modified, so as to provide that the smelting company purchase the mining company's total product of lump cinders, estimated at 12,000 tons per year, and 700 tons per month of fine cinders. It appeared that the cinders were the product obtained by burning the ore to extract the sulphur, and the quantity depended on the

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

demand for sulphur. Because of the war the demand for sulphur greatly increased, so as to increase the quantity of cinders produced; but the smelting company refused to receive more than 12,000 tons of lump cinders per year, and plaintiff sued for breach of the contract. *Held*, that the later contract, standing alone, required the smelting company to take the mining company's entire output, and the provisions of the earlier contract did not indicate a contrary intention, since they were, at most, rendered merely ineffectual or operative only as to the fine cinders, or, if they were conflicting, they were superseded by the later provision.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 192, 193.]

3. EVIDENCE ⬤═215(1)—ADMISSIONS—SALES—CONSTRUCTION OF CONTRACT—INTENTION.

In a suit involving the construction of two contracts for the sale of mineral products, the later of which modified the earlier, a subsequent proposal by one of the parties for a new contract, in which were embodied certain provisions of the first contract, is inadmissible as an admission that those provisions were not superseded by the second contract, since it is the intent expressed in the words .used by the parties, and not what their subsequent admissions show their unrevealed intent to have been, that governs the construction of a contract.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 754.]

4. EVIDENCE ⬤═448—PAROL EVIDENCE—PRELIMINARY NEGOTIATIONS.

Evidence of the negotiations between the parties leading up to the execution of a written contract, which was expressly intended to embody the agreement reached, is inadmissible, though the language of the written contract is ambiguous, since the parties by their agreement excluded the consideration of such evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2066–2082, 2084.]

5. EVIDENCE ⬤═448—PAROL EVIDENCE—SITUATION OF THE PARTIES.

Where the language of a written contract is ambiguous, evidence as to the situation of the parties when it was entered into is admissible, to the extent that it assists in determining the meaning of the language used.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2066–2082, 2084.]

6. SALES ⬤═87(3)—CONSTRUCTION OF CONTRACTS—EXTRINSIC CIRCUMSTANCES.

Where defendant purchased the output of lump cinders, produced by burning the ores from plaintiff's mine, estimated at 12,000 tons per year, and 8,400 tons of the fine cinders, which were more expensive to handle, and it appeared that defendant desired to use the cinders for reducing an equal quantity of the ore from its mine, the output of which varied, and which defendant claimed could produce 3,000 tons per month, the extrinsic circumstances tended to confirm the construction of the contract as one for the purchase of the entire output of lump cinders, regardless of quantity, rather than as a purchase of only 12,000 tons per annum.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 245–247.]

7. SALES ⬤═71(4)—CONSTRUCTION—ENFORCEMENT—CHANGED CONDITIONS.

Defendant cannot be relieved from his contract to purchase the entire output of certain by-products from plaintiff's ores by the fact that the outbreak of the war caused a demand for the principal product, which increased the output of the by-product to a point far beyond the estimates of the parties.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 192, 193.]

8. SALES ⬤═384(1)—REMEDIES OF SELLER—DAMAGES FOR BREACH OF CONTRACT.

Where defendant refused to accept any more cinders from plaintiff during the then current year, in violation of his contract to purchase the entire output, plaintiff cannot recover damages for refusal to accept cin-

ders produced within the year, but so late that they could not have been delivered to defendant until after the beginning of the next year.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1098, 1102–1104.]

9. SALES ⬥➞71(4)—CONSTRUCTION OF CONTRACT—PURCHASE OF OUTPUT—ESTIMATES.

In a contract for the purchase of the entire output from plaintiff's mines, a provision that plaintiff shall make yearly advance estimates of the output only requires a bona fide estimate, and does not relieve defendant from its obligation to purchase the entire output, though it exceeded the estimate.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 192, 193.]

In Equity. Suit by the Eustis Mining Company against Beer, Sondheimer & Co., Incorporated. On defendant's motion for reargument after decree for plaintiff. Decree vacated, and cause ordered to stand for further hearing as to damages.

This is a suit in equity to obtain the construction of a contract and to recover for damages for its partial breach. The ground of equitable jurisdiction need not be considered, as both parties assent. The turning question is the construction of the contract; the plaintiff claiming that the defendant was obliged to take the "total production" of its cinders in any one year, regardless of the amount, and the defendant claiming that the obligation on both sides is limited to 12,000 tons. The contract was in two parts: First, a formal contract, executed on February 11, 1914; and, second, a letter between the parties on June 30, 1914, which was preceded by certain oral negotiations. The two contracts are as follows:

"This agreement, made and entered into this 11th day of February, 1914, by and between Beer, Sondheimer & Co. (American Branch), party of the first part, and the Eustis Mining Company, a corporation duly organized and existing under and by virtue of the laws of the province of Quebec, Canada, party of the second part, witnesseth:

"Whereas, the party of the first part has entered into a final agreement with the Virginia Smelting Company for a lease of its plant at West Norfolk, in the state of Virginia; and

"Whereas, the contract contemplates the improving of the plant of the Virginia Smelting Company for the purpose of combining their ores and the ores of Beer, Sondheimer & Co., for treament in said plant; and

"Whereas, it is to the advantage of the Eustis Mining Company to have Beer, Sondheimer & Co. use certain of the ores of the Eustis Mining Company in conjunction with their own ores in the operation of said plant, and that said use would be to their mutual advantage and profit:

"Now, therefore, in consideration of ten dollars ($10) lawful money of the United States by each of the parties hereto to the other in hand paid, the receipt whereof is hereby acknowledged, and for the further consideration of the execution by the party of the first part of the final agreement with the Virginia Smelting Company, and for other good and valuable considerations, it is agreed as follows:

"First. The party of the second part agrees to deliver to the leasing company, which under the final agreement between Beer, Sondheimer & Co. and the Virginia Smelting Company is to take a lease of said smelting plant, during each year beginning with February. 1, 1914, and ending with January 16, 1924, the copper cinder resulting from the pyrites produced from pyrites ores from the mines of the party of the second part, situated at Eustis, Quebec, in the quantities as requested by said leasing company, but not exceeding:

| 26,500 | tons per year from | January | 17, | 1914, | to | January | 16, | 1917 |
|--------|--------------------|---------|-----|-------|-----|---------|-----|------|
| 25,500 | " " " " | " | " | 1917, | " | " | " | 1919 |
| 18,200 | " " " " | " | " | 1919, | " | " | " | 1924 |

⬥➞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"The lump and fine cinder to be in the same proportion as produced by the acid works burning Eustis ore, and so located geographically that they can ship to Norfolk.

"Second. It is agreed that the said leasing company (or during 1914, if said leasing company shall not have been organized, Beer, Sondheimer & Co.) shall as soon as reasonably possible give notice of the leasing company's reasonable requirements for the period from January 17, 1914, to July 31, 1914, and shall prior to March 1, 1914, and thereafter prior to February 1st in each year, give notice in writing to the party of the second part of the tonnage to be shipped hereunder during the six (6) months beginning with the 1st day of the succeeding August, and in like manner notice prior to August 1st in each year of the tonnage to be shipped during the six (6) months beginning with the 1st day of the succeeding February, and the party of the second part, upon receipt of such notice from the said leasing company, agrees to ship such tonnage as far as is practical in regular monthly installments. It is further agreed that the said leasing company shall accept this contract and agree to pay for all of the cinder which it may request the party of the second part to deliver, and payments to be made under the terms hereinafter mentioned.

"Third. It is agreed that the price to be paid for the cinder is to be based on the value of the copper contained as shown by the battery assay, less one (1) unit, figured at the average quotation for electrolytic copper as quoted by the Engineering and Mining Journal for the week during which the material is delivered at West Norfolk, Va., less one and one-half cents (1½¢) per pound. Payments are to be made in cash sixty (60) days after the sampling, and shall, at the option of either party, be discounted at the rate of five per cent. (5%) per annum.

"Fourth. It is understood and agreed that the weighing and sampling of the cinder are to be done at the receiving works, and settlement for the same shall be made after each cargo or consignment, based on samples put up at the said receiving works immediately on the arrival of the cinder, and submitted to Ledoux & Co., or other mutually satisfactory chemists, whose assays shall be final. Eustis Mining Company shall have the right to verify the correctness of the weights and samples by such examination of books, records, and accounts, and in such other ways, as it deems proper. Incorrect weights shall be settled for forthwith upon the basis of the corrected weights. Delivery to be made f. o. b. ship West Norfolk, Va., except that the party of the second part has the option of making delivery at West Norfolk by rail, in which event they shall be credited with the actual saving in cost as given by the manager of the works as compared with shipments arriving in vessels. In the matter of settlements for cinder arriving by rail, the material arriving in each calendar month shall be considered as one lot, and payment for the same shall be made sixty (60) days from the average date of receipt. Discharging to be done by the leasing company at its own cost and expense, and at the rate of at least six hundred (600) tons per working day. Demurrage incurred by failure to unload at the above rate shall be paid for by the leasing company. The said leasing company has the right to take deliveries of the cinder f. o. b. producing point, and in the event that said leasing company takes such deliveries at the producing point the party of the second part shall pay to the said leasing company the actual freight thus saved.

"Fifth. It is mutually understood and agreed that it is of the essence of this agreement that the party of the second part shall ship cinders to the Norfolk plant, within the tonnages specified in paragraph 2, as a first obligation. It is understood, however, that the party of the second part shall not be obligated to ship cinders from such a distance that the charges upon the same, after allowing for sulphur and copper values, shall leave less than fifty cents (50¢) per ton profit to the party of the second part after producing and selling the ore. It is understood and agreed that the party of the second part may sell ore at distances too great to allow the resulting cinder to be shipped to the leasing company, provided it maintains at all times during the term of this contract a supply of ore sufficient to sell to consumers from whom the cinders can be shipped to the leasing company at West Norfolk, Va.

Sixth. It is mutually understood and agreed that in the event that the party of the second part is unable, during the life of this contract, to sell, in.

addition to the contracts now in force, sufficient ores to pyrite burning concerns to produce the tonnages of cinder agreed to be shipped to the said leasing company in paragraph 2 herein, then the party of the second part shall only be obligated to ship to the said leasing company such cinder as is produced from the ores of the party of the second part which are actually sold and burned; excepting, however, that the party of the second part shall not be obligated to ship hereunder cinder covered by a certain contract between the Nichols Copper Company, ending about March 28, 1913, and the party of the second part, and the contract with Beer, Sondheimer & Co. and the party of the second part, dated May 15, 1912, mentioned in paragraph 7 herein.

"Seventh. It is understood and agreed that fine cinder covered by existing contracts with the party of the first part shall hereafter be shipped to the leasing company at West Norfolk, under the terms and conditions hereinbefore mentioned and as a part of the tonnage stipulated herein. It is distinctly understood and agreed, however, that the contract between the parties of the first and second parts herein, dated May 15, 1912, for fourteen thousand (14,000) tons of lump cinder, shall not be in any way altered or amended hereby. If said lessor terminates said lease for breach of condition, Eustis Mining Company may terminate this agreement. If the lessee gives notice to terminate said lease as therein provided, then Messrs. Beer, Sondheimer & Co. may terminate this contract by twelve (12) months' notice. If the lessee gives notice to terminate said lease under clause (d) of the cancellation clause therein, then Messrs. Beer, Sondheimer & Co. may terminate this contract by one (1) month's notice. This contract shall bind and insure to the benefit of the heirs, legal representatives, and assigns of the party of the first part and the successors and assigns of the party of the second part. It is expressly agreed that the Eustis Mining Company may reorganize as a partnership, association, or corporation under other laws; the new concern assuming the obligations of the old hereunder. It is mutually agreed that this contract is in substitution for an agreement between the same parties made and entered into February 17, 1913, which agreement is hereby canceled.

"In witness whereof, the party of the first part has set its hand and affixed its seal, and the party of the second part has caused this instrument to be executed and affixed its corporate seal by its duly authorized officers the day and year first above written.　　　　Beer, Sondheimer & Co.,

　　　　　　　　　　　　　　　　　　　"By [Signed] O. Frohnknecht.
　　　　　　　　　　　　　　　　　"The Eustis Mining Company,
"In Witness:　　　　　　　　　　　　By [Signed] F. E. Eustis.
　　———————
　　———————"

"New York, June 30/14.

"The Eustis Mining Company, Boston, Mass.—Gentlemen: Referring to our contract of February 11, 1914, it has been agreed between us that we purchase from you for a period of ten (10) years beginning from July 1, 1914, and ending July 1, 1924, your total production of lump cinder, estimated to be twelve thousand (12,000) tons per year, at the terms and conditions of our contract of February 11, 1914. We also purchase from you seven hundred (700) tons per month of fine cinder for the same period of ten (10) years at the terms and conditions of our contract of February 11, 1914. We have the right, any time after July 1, 1919, to cancel this contract for lump and fine cinder.

"In case your production of lump cinder should be decreased for any reason beyond your control to such an extent that the seven hundred (700) tons per month of fine cinder would amount to more in tons than the lump cinder produced during the same period, then we shall not be obliged to buy from you more tons of fine cinder per year than you give us of lump cinder. You will advise us first of every year as to the approximate amount of lump cinder to be expected during that coming year.

"It is further agreed, in regard to fine cinder, that you estimate your production two thousand (2,000) tons per month; that we have agreed to release from our option seven hundred (700) tons per month, which you are entitled

to have for leaching and sintering. Seven hundred (700) tons are to go to us as above. In regard to the balance of six hundred (600) tons, we are to advise you first of each year whether we desire to buy these six hundred (600) tons during the coming year at the terms of the above-mentioned contract, or whether you are at liberty to use it yourselves or dispose of it elsewhere; and it is further agreed that in case you should be unable to produce full two thousand (2,000) tons per month, as estimated, you are to be entitled to one-third ($\frac{1}{3}$) for your leaching, we to one-third ($\frac{1}{3}$) of the amount actually produced for our purposes, and one-third ($\frac{1}{3}$) to be subject to our option, to buy it or decline it as we see fit.

"The above arrangement cancels both our contracts with you for fine cinder, dated April 4, 1912.

    "Yours very truly,           Beer, Sondheimer & Co., A. B.,
                               "[Signed]   O. Frohnknecht.

"Accepted: —————"

To an understanding of the case it is necessary to say that the cinder in question is the end product of a process of burning the plaintiff's ore to extract from it the sulphur. Its amount, therefore, depends in the first instance upon the ore produced, and in the second upon the demand for ore by the sulphur burners. The demand for sulphuric acid was slack during the year 1914, and the first half of 1915; but the demand for munitions caused by the Great War greatly stimulated the business during the second half of the year 1915. The plaintiff tried to make the defendant take all the resulting cinders and thus the dispute arose. In February, 1914, the Virginia Smelting Company mentioned in the contract was substantially owned by the plaintiff, or those who controlled it, and had been let to Beer, Sondheimer & Co. at about the time of the contract itself. Beer, Sondheimer & Co. also controlled large copper ore deposits in the island of Cuba, known as the Cobre mine, and it was these ores which it proposed to use in conjunction with the cinder covered by its contract for the purpose of extracting the copper from the Cobre ore. Other facts are stated in the opinion.

Richard W. Hale, of Boston, Mass., and Arthur C. Patterson, of New York City, for plaintiff.

Henry N. Arnold, of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above). The form in which this case is now presented is embarrassing to its disposition. Being dissatisfied with the decision of Judge Sheppard, who tried the cause and entered a decree for the plaintiff, the defendant moved before him for a reargument, which he found it impossible to grant, owing to his immediate departure for Florida. He suggested that, in place of such a reargument, application for reargument be made to a local District Judge, and the defendant thereupon applied to me. The plaintiff consents that I may hear the application for a reargument, though the motion is certainly anomalous, but refuses to consent that the cause be reargued, unless as a condition I find that, under the rules governing such motions, the cause is proper for reargument. This is the reason for my embarrassment, because I have obviously nothing to go on in determining whether Judge Sheppard omitted to consider some of the points raised, except his opinion, and every one knows that a judge disposes of much matter which he does not put in his opinion. Before I could, therefore, undertake to make a new decision, especially one different in result from Judge Sheppard's, I should have to reach a conclusion upon that preliminary matter.

Although it therefore upsets the proper order of consideration, I shall nevertheless first take up the points really at issue, and indicate my own opinion upon them, since it so happens that I agree with Judge Sheppard. This cannot prejudice the plaintiff, and, if it does not satisfy the defendant, at least it achieves that reconsideration of the case which is its present object.

The main controversy turns upon the meaning of the letter of June 30, 1914, especially as to whether the phrase, "estimated to be 12,000 tons per year," effects a limitation upon the general undertaking to accept the plaintiff's "total production." The defendant does not, indeed, urge that, standing alone, the clause would protect it; its position rather is that, taken in conjunction with the preceding and formal contract of February 11, 1914, either it becomes apparent that the intent was to limit the defendant's obligation to 12,000 tons, or at the least that the resulting contract was so ambiguous as to admit extrinsic evidence of the meaning of the parties, as set forth below. Its chief reason for insisting upon a reargument is because it insists that Judge Sheppard showed in his opinion a failure to apprehend this position in detail.

[1] The defendant is, of course, on solid ground in saying that the two instruments must be read together, in so far as they may be reconciled with each other. It is equally solid ground to say that, in so far as they cannot be reconciled, the later must prevail. We start, moreover, with the assumption, which is not disputed, that, broken from the earlier contract, the second would have bound the defendant to accept the total output, regardless of its amount. Brawley v. U. S., 96 U. S. 168, 24 L. Ed. 622. In judging how far this naked meaning may be changed by its setting, however, we must recognize, not only that there is a critical breaking point, as it were, beyond which no language can be forced, but that in approaching that limit the strain increases. To reconcile two clauses, whose native meanings conflict, we must therefore find the resultant of their several opposing forces. With this premise I may begin the detailed consideration of the contracts.

[2] In the earlier contract, the tonnages were maximums inserted for the plaintiff's protection, and the fifth and sixth articles, the chief reliance of the defendant, were in further execution of that purpose. The fifth article may be paraphrased as follows:

"While the plaintiff is to give preference to the defendant's deliveries, still it need not ship cinders where the profits are less than 50 cents. Yet, although it may ship ore to such points, nevertheless, in justice to the preference so acknowledged, it must keep in reserve enough ore to supply all sulphur burners within the 50 cent radius. In short, it must not allow the distant sales to trench upon its local cinder market, upon which the defendant shall have the right absolutely to rely without impairment."

The sixth article is only complementary to the fifth; indeed, it is hardly necessary:

"If the plaintiff fails to sell to sulphur burners out of the reserve ore kept on hand enough to fulfill the tonnages of cinders specified, then it need ship only so much cinders as arise out of the ore actually sold. In short, it does not guarantee its market with the sulphur burners."

Together these articles provide that, while the plaintiff is bound to fill all sulphur burners' orders within the zone of cheap shipment up to the defendant's possible 'orders, it was not liable for the absence of such orders.

Coming, now, to the application to the later contract of these articles, we need not be troubled by the reconciliation of the fifth. If we assume that the clause called for the acceptance of an unlimited production, it was even more necessary that the defendant's calls should be preferred. It was proper, therefore, to provide that, if any sales were to be made beyond the 50 cent radius, they must not be at the possible expense of the local market. Such a clause fits as well upon the plaintiff's interpretation of the second contract as upon the defendant's. With the sixth article, however, it is different. If the clause in the later contract only binds the plaintiff to furnish its total production, it is absurd to provide against a deficiency in the sulphur burners' production. They will produce as much as they produce in any event, and the plaintiff's obligation is measured only by what they produce. On the other hand, if the plaintiff was bound to produce and the defendant to accept 12,000 tons, the clause was necessary.

If the article had occurred in the second contract itself, this might have created an embarrassment; but it does not. It is in an earlier contract, and it is one thing to have two provisions to reconcile in a single contract, and another to determine whether a provision of an earlier contract should survive. Indeed, until we have decided that it was intended to survive, no conflict can arise; we are free to select that meaning which is most natural for the later clause, and say that all earlier provisions are superseded. To raise the conflict is already to beg the question, because the conflict presupposes the survival of the earlier provision.

But, even though it be assumed that the general purpose to preserve the earlier contract, so far as possible, could be specifically extended to article 6, it would not, in my judgment, be sufficient. It must be remembered that there is no actual conflict between the two; the argument rests only upon the redundancy of the earlier clause, if it be preserved. It is not even wholly redundant, for it might be intended to provide against a possible supposition that the plaintiff was bound to fulfill its yearly estimates after they were made, or that it applied to the "fines" which were to be produced in stated quantities, though it is true the second contract carried its own excuse for failure to produce the required amount of "fines."

Yet, even though the article survived and could not be construed as above, I should still, on the balance of interpretation, not be disposed to make its redundant presence control the language of the clause. The parties showed in the first contract that they could say so, when they meant to fix the plaintiff's obligation quantitatively; and they showed it again in the second contract itself, as respects "fines." They spoke of an "estimated" total production of "fines" in that very contract, but they did not agree that the defendant should take all, or even an aliquot share, of the production. On the contrary, they provided that it should take certain proportions of the sum at which the

estimate was fixed, or less if the production was less. In short, they fixed by quantity their obligation touching "fines," notwithstanding that they were thinking of its estimated maximum. When we remember that "fines" were the less desirable part, requiring a special, or sintering machine, it seems to me impossible to resist the conclusion that, while the defendant did not suppose that it would get much more than 12,000 tons of "lump," it was ready to take all that it could get. The surplus beyond 12,000 tons has no doubt turned out immensely greater than the defendant could have anticipated, which is a serious matter for it; but that does not change its actual purpose as expressed at the time of the contract. Article 6 I should therefore regard, if I had to reconcile it, either as applicable to "fines" only, as a protection against the statement of yearly estimates required of the plaintiff, or as a needless provision for any purpose, which did not overbear the meaning of the rest of the contract.

[3] This result the defendant resists, because of evidence dehors the writings. The evidence is of three sorts: First, the admission or declaration arising from the "Proposed Combination Agreement of April 8, 1915"; second, the contemporaneous negotiations of the parties; third, the general setting in which the contracts were drafted. The first consists of a proposed contract, proffered by the plaintiff, which it is alleged the accompanying correspondence shows to have been intended to subsume the existing contracts. The defendant's theory is that it may be used as an interpretation of those contracts, certainly to the extent of proving how much of the earlier contract survived, because it is an admission by the plaintiff of what it thought those contracts, taken together, effected. The defendant does not, of course, suppose that the "Proposed Combination" could affect any actual obligations of the parties, since it was never accepted; but it asserts that it shows which of the earlier stipulations must have been intended to endure. As articles 5 and 6 are incorporated in the "Proposed Combination," with some important modifications, not necessary to consider, the defendant insists that the plaintiff has admitted that they were meant to continue.

This evidence is, I think, irrelevant to the issues, for a reason going to the very nature of a contractual obligation. It is quite true that we commonly speak of a contract as a question of intent, and for most purposes it is a convenient paraphrase, accurate enough, but, strictly speaking, untrue. It makes not the least difference whether a promisor actually intends that meaning which the law will impose upon his words. The whole House of Bishops might satisfy us that he had intended something else, and it would make not a particle of difference in his obligation. That obligation the law attaches to his act of using certain words, provided, of course, the actor be under no disability. The scope of those words will, in the absence of some convention to the contrary, be settled, it is true, by what the law supposes men would generally mean when they used them; but the promisor's conformity to type is not a factor in his obligation. Hence it follows that no declaration of the promisor as to his meaning when he used the words is of the slightest relevancy, however formally

competent it may be as an admission. Indeed, if both parties severally declared that their meaning had been other than the natural meaning, and each declaration was similar, it would be irrelevant, saving some mutual agreement between them to that effect. When the court came to assign the meaning to their words, it would disregard such declarations, because they related only to their state of mind when the contract was made, and that has nothing to do with their obligations. This is, of course, a wholly different question from a preceding or subsequent agreement assigning an agreed meaning to any given words used in another contract. Marriner v. Luting, Fed. Cas. No. 9,104.

[4] The second class of evidence is of the negotiations which attended the execution of the contract of June 30th. As to these the rule of exclusion applies which the plaintiff invokes. Since the parties certainly intended, as appears by the mere character of the document, to make out of the writing a definitive memorial of their words, that intent the law will effect, and it can do so only by disregarding everything but the writing itself. Hence all other verbal expression must be eliminated; the writing is agreed upon as the final verbal act. The ambiguity of the written language does not determine this question in any way whatever, in spite of some occasional confusion of language in the books; but the exclusion of such negotiations depends upon their agreement to exclude, and extends so far as the parties have agreed that it shall exclude all but the written words, and no further. In the case at bar it is plain enough that the parties meant not to rely on the oral negotiations; that they wished to have a complete and final written memorial of their obligations. That purpose, being lawful, the court will fulfill by disregarding all other verbal expression, except that selected.

[5] The admissibility of the general surroundings in which the contract was written (Merriam v. U. S., 107 U. S. 437, 441, 2 Sup. Ct. 536, 27 L. Ed. 531), rests upon quite a different basis, one which can be said with a nearer approach to accuracy to turn upon the ambiguity of the written words. All the attendant facts constituting the setting of a contract are admissible, so long as they are helpful; the extent of their assistance depends upon the different meanings which the language itself will let in. Hence we may say, truly perhaps, that, if the language is not ambiguous, no evidence is admissible, meaning no more than that it could not control the sense, if we did let it in; indeed, it might "contradict" the contract—that is, the actual words should be remembered to have a higher probative value, when explicit, than can safely be drawn by inference from surroundings. Yet, as all language will bear some different meanings, some evidence is always admissible; the line of exclusion depends on how far the words will stretch, and how alien is the intent they are asked to include.

[6] There remains to consider, therefore, the general situation of the parties as disclosed to each other, as an assistance in understanding their words. Now the total capacity of the defendant's smelter was apparently about 36,000 tons of cinders, dependent in practice, of course, upon a corresponding amount of silicious copper ore which they

expected to get from the Cobre mine. Just what the prospecta of that mine were does not definitely appear; indeed, being a mine, they must obviously have remained uncertain. In the spring of 1914 apparently they were not good, but the mine had been very irregular in its production, and Frohnknecht had at one time given F. A. Eustis "the impression" that it would produce thousands of tons a month; he had told him that he expected more than he could handle, which would have been 3,000 tons a month. How much ore was actually forthcoming does not appear. The contract, article 4, perhaps gives some color to the plaintiff's position that the defendant contemplated sales of the cinders, besides use of them at its smelter, though the matter is not clear. Therefore, while the supposed "abnormal" production of the plaintiff's mine is in a sense true, because never before had there been 20,000 tons of "lump" cinders produced, yet it should be recalled that the defendant clearly contemplated the possibility of its needing 36,000 tons of "lump" and "fines" in February, 1914, else there was no conceivable reason why the plaintiff should have fixed its limit at that amount. Since by the amendment the "fines" were limited to less than 8,500 tons, that possible total consumption, if ever reached after June 30th, would have been filled by "lump" to the extent of 27,500, a more desirable situation for the defendant, had it chanced to want 36,000 tons, than under the first contract. The consumption of 20,000 tons of "lump" by the defendant does not, therefore, seem to me so completely out of the possibilities as to involve the gross injustice the defendant supposes.

[7] Still, I agree that the production occasioned by the Great War was a surprise to both sides, and that it was not within their forecast of the future. It is altogether likely that the defendant would have cried off upon the whole bargain, had they thought it probable. Contracts cannot, however, be treated so loosely; if parties wish more certainty, they must use more certain words. The case, therefore, ends where it starts, with the initial acceptance clause as the best indication of what the meaning was; it admits of no interpretation which does not distort it beyond what the words will bear. If it be necessary to treat the sixth article as superseded, I treat it so, rather than by an attempted reconciliation to wrest the words so far from their meaning. Budge v. U. S. Smelting & Refining Co., 104 Fed. 498, 43 C. C. A. 665 (C. C. A. 9), is the defendant's best case; but it turned upon the buyer's express undertaking to pay for specified amounts of timber, "about 600," "about 15,000." In addition, no doubt the seller was bound to furnish "all mining timbers required and used," if they came to more than the minimums. T. B. Walker Co. v. Swift & Co., 200 Fed. 529, 119 C. C. A. 27, 43 L. R. A. (N. S.) 730 (C. C. A. 5). Smoot v. U. S., 237 U. S. 38, 35 Sup. Ct. 540, 59 L. Ed. 829, is not without some pertinence to the subject.

[8] The remaining question relates to the measure of damages. Under the contract the buyer was bound to accept the cinder as it was delivered, and without limit as to the amount which was tendered during the course of any calendar year. The refusal of the defendant to accept any greater tonnage during the year 1915 than 12,000 ab-

solved the plaintiff from further deliveries during that year, but did not, of course, absolve it from proving by way of damages what added tonnage it would have tendered during that year, but for the refusal. The defendant's letters which contain this refusal must be understood to refer to the date of arrival; that is, to such cinders only as might arrive at West Norfolk during the year 1915. In his testimony F. A. Eustis says without contradiction that Frohnknecht told him (Q. 148, 149) that he then turned back to the plaintiff all "the production which was made in excess of 12,000 * * * produced during the latter part of the year 1915." Strictly, this might be taken as including so much as was produced during the last two weeks or ten days of 1915, too late for arrival during 1915; but obviously it should not be so understood. The proper meaning is that the plaintiff need not tender any more of the cinder than it could have tendered during 1915. There is no evidence of what it could and would have tendered during 1915, and no basis for such damages. Perhaps the parties can agree upon the amount produced before say December 15th or 20th, which it is safe to assume the plaintiff would have tendered. If not, the plaintiff may have the case reopened to present that proof. It is quite clear that to this extent the evidence needs reconsideration, and I am satisfied that Judge Sheppard would do so, if he could be consulted.

[9] The provisions that the plaintiff shall make yearly estimates, and shall ship, so far as practicable, in regular monthly installments, do not affect the result. Both these provisions endure, and the plaintiff must abide by them so far as possible; but the first only calls for a bona fide estimate, nothing more, and there is no evidence that the second was violated. The defendant's objections throughout were to that construction of the contract by which they could be compelled to accept more than 12,000 in any case, not to the irregularity of the distribution.

The decree will be vacated, because of the matter of damages, and the cause stand over for further hearing to consider the matter above specified, unless the parties can adjust their difference out of court.