GEORGE M. COLVOCORESSES *v.* W. S. WASSERMAN CO., a corporation of the State of Delaware.

*(January* 10, 1938.)

LAYTON, C. J., HARRINGTON and RODNEY, J. J., sitting.

*Dudley C. Lunt* for plaintiff.

*Aaron Finger* (of Richards, Layton and Finger) for defendant.

Superior Court for New Castle County, Action of Assumpsit on a Contract, No. 122, September Term, 1935.

HARRINGTON, J., delivering the opinion of the court:

The defendant has demurred to the first and second counts of the plaintiff's amended declaration. It is not necessary for us to give any further consideration to the first count because the plaintiff concedes that a count containing precisely the same allegations was before this court on demurrer in the unreported case of *Colvocoresses v. Wasserman Co.* decided February 29th, 1936, and was then held to be so defective in substance that the plaintiff could not base a cause of action on it. This was because the plain-

tiff's rights necessarily depended on the acquisition by the defendant of title to the mill tailings and mine dumps on the Congress property, and because that count, when read in connection with the contract declared on and the prior contracts attached to it, and composing a part of it, did not allege the acquisition of any such title by him.

The amended second count of the declaration alleges, in part:

1. That "when the word 'acquire' is used in connection with, or in reference to mining property, or transactions, or to the exploitation of minerals, mine dumps, or mill tailings, colloquial usage invests that word with an ambiguous content, inclusive of two or more concepts in the legal heirarchy of property rights. And the plaintiff further avers that this usage both existed and was well known to the plaintiff and to the defendant prior to and at the time of the execution of their said agreement, and that it was employed by both parties from the inception of and throughout their dealings and negotiations *inter sese* from prior to the execution of their said agreement until sometime after the date of a certain parol agreement as is hereinafter averred."

2. That "in employing in the aforesaid agreement between the plaintiff and the defendant, the word 'acquire' with reference to the said mill tailings and mine dumps covered by the said Congress Contract, it was used in accordance with the aforesaid colloquial usage, to refer to the acquisition by the defendant of such rights as it would acquire with respect to the said mill tailings and mine dumps by the payment of the said sum of Six Thousand Dollars for the benefit of the said Reid under the aforesaid Congress Contract and the various assignments thereof heretofore averred and by the assignment by the plaintiff to the defendant of all of the rights of the plaintiff under the said Reid Agreement."

In *Colvocoresses v. W. S. Wasserman Co.,* 8 *W. W. Harr.* (38 *Del.*) 253, 190 *A.* 607, the declaration demurred to, among other things, alleged that the word "acquire," appearing in the contract declared on, was intended by the parties to have a particular specified meaning. In fact, substantially the same meaning that the plaintiff now alleges local usage gives that word.

In sustaining the demurrer, because of that averment, we said, "Where, as in this case, the language of the contract is not in any sense ambiguous, its meaning is ordinarily a question of law for the court to ascertain from the instrument itself, and allegations as to the intent of the parties to a contract, with respect to the meaning of the words used, and whether such intent is shown by subsequent acts, or by the declarations of the parties made at or about the time of the execution of that contract, or otherwise, are usually of no importance" in construing it. See, also, *Crockett v. Green,* 3 *Del. Ch.* 466; 3 *Willist. on Cont., Rev. Ed.,* § 630; *Wig. on Evid., p.* 386, §§ 2462, 2463, 2465.

In 12 *Harvard Law Review* 412, 420, Mr. Justice Holmes, in considering the same question, also, tersely said: "I do not suppose that you could prove, for purposes of construction, as distinguished from avoidance, an oral declaration or even an agreement that words in a dispositive instrument making sense as they stand should have a different meaning from the common one; for instance, that the parties to a contract orally agreed that when they wrote 500 it should mean 100. * * *"

The rule laid down in *Colvocoresses v. W. S. Wasserman Co.,* 8 *W. W. Harr.* (38 *Del.*) 253, 190 *A.* 607, may be, in part, governed by reasons of policy, as well as by definite rules of law, *Wigmore on Evidence,* §§ 2462, 2463, 2465, but at any rate it does not dispose of the question before us.

Professor Thayer lays down the broad general rule that, "In contracts it was always recognized that familiar words may have different meanings in different places, so that 'every bargain as to such a thing shall have relation to the custom of the country where it is made.'" *Thayer's Prelim. Treat. on Evid.* 419, *note; 3 Willist. on Cont., Rev. Ed.,* § 650.

But, notwithstanding his statement, in the early days of the common law, it seems that words had a formal significance and were usually supposed to have only one unalterable meaning. 22 *Columbia Law Review* 741; *Wig. on Evid.,* §§ 2461-2463.

Mr. Williston, therefore, points out that even for the purpose of interpreting the meaning of a written contract, it may be doubted how far it was allowable in the early stages of the law to show that a word in it, having a clear and fixed ordinary meaning, bore a meaning contrary to its usual significance, if nothing in the context showed that such a particular meaning was intended. 3 *Willist. on Contracts, Rev. Ed.,* § 650; see, also, *Wig. on Evid.,* § 2461; 22 *Columb. Law Rev.* 741.

There was perhaps some conflict in the cases, but when there was no ambiguity in the language of a contract, either on its face, or when applied to the matters and things covered by it, perhaps the old rule against destroying the plain meaning of the words used usually prohibited the use of extrinsic evidence of local usage to aid in ascertaining the meaning of such words. *Willist. on Contracts, Rev. Ed.,* § 290; *Wig. on Evid.,* §§ 2461-2463; *Tatman v. Barrett, 3 Houst.* 226; see, also, *Crockett v. Green, 3 Del. Ch.* 466; *Penn Steel Casting & Machine Co. v. Wilmington Malleable Iron Co., 1 Penn.* 337, 41 *A.* 236.

That general rule is still applied in some States in this country. 3 *Willist. on Contracts, Rev. Ed.,* § 650; *Wig. on Evid.,* § 2461; 22 *Columb. Law Rev.* 741.

It seems, however, that since an early date, some evidence of surrounding circumstances has been admitted to aid in interpreting the meaning of a contract when its language, if given the usual and normal meaning, is ambiguous, either on its face or when applied to the particular facts. This was certainly true where, by the known usage of art, trade and commerce, or the like, words used had acquired a peculiar and special or technical meaning distinct from their ordinary and popular meaning. *Penn Steel Casting & Machine Co. v. Wilmington Malleable Iron Co.*, 1 *Penn*. 337, 41 *A*. 236; *Crockett v. Green*, 3 *Del. Ch*. 466; *Wig. on Evid.*, § 2464.

▆▆ Applying the same general principles, it would seem that in most cases if a word or phrase used in a contract, and even though not of a technical nature, has a particular and special meaning by local usage, or habit of speech, which was known to the parties when the contract was made, evidence of that meaning should be admitted to aid in construing that contract. *Smith v. Wilson*, 3 *B. & Ad*. 728, 110 *Eng. Repr*. 266; *Grant v. Maddox*, 15 *M. & W*. 737, 153 *Eng. Repr*. 1048; *Clayton v. Gregson*, 5 *A. & E*. 302, 111 *Eng. Repr*. 1180; *Eustis Min. Co. v. Beer, Sondheimer & Co.*, (*D. C.*) 239 *F*. 976; 3 *Willist. on Contracts, Rev. Ed.*, §§ 629, 630, 631, 648, 650; *Restat. Contracts*, § 246 (*a*); *Wig. on Evid.*, §§ 2463, 2464; 12 *Harv. Law Review* 412, 420; 22 *Col. Law Rev*. 741.

In commenting on the old rule, Professor Williston says: "But there are now numerous decisions (not all of them of recent date) where words with a clear normal meaning have been shown by usage to bear a meaning which nothing in the context would suggest. This is not only true of technical terms, but of language which, at least, on its face has no peculiar or technical significance." 3 *Willist. on Contracts, Rev. Ed.*, § 650, *supra*.

In 3 *Williston on Contracts, Rev. Ed.*, § 648, *supra*, the

same author also says: "It may be said broadly that any usage with knowledge of which both parties are chargeable is always admissible to show the meaning of the language employed. Usage is an ordinary means of proving the local or technical meaning of language, and even language, which is normally clear and unambiguous, may be shown by usage to bear under the circumstances of the case a meaning different from its normal sense."

The rule seems to be fairly stated in *Eustis Mining Co. v. Beer, Sondheimer & Co., (D. C.)* 239 *F.* 976, 985. The court said: "All the attendant facts constituting the setting of a contract are admissible, so long as they are helpful; the extent of their assistance depends upon the different meanings which the language itself will let in. Hence we may say, truly perhaps, that, if the language is not ambiguous, no evidence is admissible, meaning no more than that it could not control the sense, if we did let it in; indeed, it might 'contradict' the contract—that is, the actual words should be remembered to have a higher probative value when explicit, than can safely be drawn by inference from surroundings. Yet, as all language will bear some different meanings, some evidence is always admissible; the line of exclusion depends on how far the words will stretch, and how alien is the intent they are asked to include."

This principle was applied at an early date in *Smith v. Wilson,* 3 *B. & Ad.* 728, 110 *Eng. Repr.* 266, where evidence was admitted to show that by local usage the words "1000 rabbits" in a lease meant "1200 rabbits."

██ But, notwithstanding that general rule, if it is apparent from the express provisions of the contract, or even by implication, that the words used in it were intended to have their ordinary and usual meaning, unaffected by any alleged local usage, that intent will govern the parties, and no evidence of usage will be admitted or considered by the

court. 3 *Willist. on Contracts, Rev. Ed.*, § 656; *Chamb. H. B. on Evid.*, § 1115; *Restat. Cont.* § 246 (*b*); *Pickands, Mather & Co. v. H. A. & D. W. Kuhn & Co.*, (6 *Cir.*) 8 *F.* 2d 704; *Barnard v. Kellogg*, 10 *Wall. (U.S.)* 383, 19 *L. Ed.* 987. Whether, however, that is the intent of the parties to a contract necessarily depends on its context when read as a whole. 3 *Willist. on Contr., Rev. Ed.*, § 656.

■ Applying these principles to the facts of this case, the plaintiff has declared on a contract, dated February 11th, 1935, under which he alleges that he is entitled to receive the sum of $12,000 as a liquidated consideration in lieu of employment as a mine manager. His rights under that contract necessarily depend, in part, on the provisions of two prior contracts, and, also, on the provisions of an assignment of one of them, and because of that fact copies of all of these papers are attached to his declaration.

The essential provisions of these contracts were considered in some detail in the unreported case of *Colvocoresses v. Wasserman Co., supra.* From that case and from the contracts attached to the declaration, it appears that on February 7th, 1935, T. J. Byrne, Trustee, entered into an agreement with Neil C. Clark, with respect to a mining property, known as the Congress mine. That contract was entitled an "Option Lease and Option to Purchase Agreement." It provided for a deposit of $6,000 in escrow by Clark for a period of 30 days during which Clark might make an examination of the property, and the money was to be paid to Byrne if Clark elected to exercise the rights granted to him by the contract. Upon the payment of the sum of $6,000 to Byrne, the property was leased to Clark with the right to purchase. The purchase price, exclusive of the sum of $6,000, was fixed at $20,000, payable in three installments of $6,666.67, on or before June 4th, September 4th, and December 4th, 1935.

Under that contract Clark had the right to take pos-

session and work the property in advance of payment of any of the installments of the purchase price, subject, however, to the payment of a royalty of 7½% of gross revenues derived from the property, the amounts paid as royalty to be deducted from the "next succeeding installment of the rental or purchase price."

It was provided that instruments of conveyance and transfer of the property should be deposited in escrow, delivery to be made "if and when the said rental or purchase price shall have been fully paid."

It was, also, provided that time was of the essence, and upon failure of Clark to make any payment due or to perform any act agreed upon within the time limited Byrne might declare a forfeiture and retain all money paid for rental, as liquidated damages, and might, also, retain all machinery, equipment and personal property placed on the premises. That contract was assigned to F. W. Reid, Jr., on February 9th, 1935, expressly subject, however, to the obligations and conditions of the Byrne-Clark contract, or as it will be called, "the Congress Contract." That assignment was, also, in escrow contingent upon the full performance by Reid of all of the terms of the Congress Contract. On the same day, February 9th, 1935, Reid entered into an agreement with the plaintiff. Primarily it was a contract for the sale to the plaintiff of a portion of the Congress property to which Reid had become entitled under the Clark assignment; that portion being mine tailings and dumps on the property.

The first section of that contract recited that Reid had obtained an assignment in escrow of an option to purchase all of the real and personal property of the Congress Mining Company, contingent upon full performance of all the conditions of the "Congress Contract."

Section 3 recited, among other things, the necessity for

the deposit on February 11th, of $6,000 in escrow for 30 days during which the property might be examined and then, at the option of Colvocoresses, the plaintiff, the money was to be returned to him or paid to Byrne, Trustee, as part of a total purchase price of $31,200. Three payments of $6,666.67 each were to be made as provided in the Congress Contract and three payments of $1,733.33 were, also, to be made to Clark on May 19th, August 19th, and November 19th, 1935.

In Section 4, it was recited that Reid was temporarily unable to deposit the $6,000 in escrow, and it was provided that the plaintiff was to make that deposit and upon the payment of the amount to Byrne, Reid was to execute a conveyance of the mill tailings and mine dumps in escrow, which was not deliverable to the plaintiff unless and until Reid, or the plaintiff, on Reid's behalf, "shall in due season and in pursuance to the terms of the Congress contract and this instrument acquire a valid and legal title to the same by completing and carrying out all the terms and conditions of the Congress contract, and this instrument, including the full payment of the remainder of the purchase price."

By Section 5 it was provided that the plaintiff should have a period of time, not exceeding ten years, within which to treat and work the tailings and dumps.

By Section 7 it was provided that if Reid, after March 13th, 1935, should be unable or unwilling to make the further payments, as stipulated, the plaintiff might make them on his behalf, and in that event, the plaintiff would be entitled "upon the completion of the Congress Contract" to receive from Reid a conveyance of "such proportionate interest in said Congress property (other than the mine dumps and mill tailings) as the payments made by second party shall bear to the total purchase price, but not to exceed a maximum of eighty-five per cent (85%)."

On February 11th, 1935, the plaintiff, also, entered into the contract with the defendant; but that contract was subject to the Congress Contract and the Reid-Colvocoresses contract.

By Article 1, it was provided that the plaintiff should investigate the tailings and dumps for the defendant, for which services he should receive $500 and certain expenses.

By Article 2, it was agreed that upon the payment of the $500, the plaintiff should assign to the defendant all his rights and privileges to be acquired under the Reid agreement, provided the agreement was continued through the application toward the purchase price of the $6,000, and during the 30-day period the plaintiff should make a physical investigation of the tailings and dumps to determine their quantity and value.

By Article 3, it was provided that the defendant should notify the plaintiff of its intention to exercise the option on the tailings and dumps under the Reid agreement, and upon a negative decision the agreement should be cancelled.

By Article 4, upon the exercise of the option, and within 5 days thereafter, the defendant was to deposit $6,000 to replace a like amount deposited by the plaintiff in accordance with the Reid agreement, to be used as a "first payment on the Congress property under the terms of the 'Congress Contract' and Reid agreement."

Articles 5 and 6 were as follows:

Article 5: "In the event Second Party acquires the tailings and dumps covered by said Congress Contract First Party shall be entitled to a five per cent (5%) non-assessible interest therein, subject, however, to Second Party's right to be reimbursed for all expenditures by it made in acquiring, developing and/or exploiting said tailings and dump material. A similar arrangement shall apply with respect to any other property (including the mine) covered by the Congress Contract provided such property be acquired by Second Party. Second Party, if it so desires, may transfer any of such properties to a corporation but shall in such event cause such corporation through the issuance of stock to First Party to preserve effectually First

Party's interest as above mentioned, subject to Second Party's right of reimbursement as hereinabove set forth.

"Second Party will also appoint First Party as Manager for the operation of the Congress tailings and mine dumps with the authority and duties usual to such position and with a salary of Five Hundred Dollars ($500.00) per month starting March 1st, 1935. First Party in carrying out his duties as Manager will be subject to the instructions of the proper officials and Board of Directors of Second Party or of any Company that may be organized for the erection of a treatment plant and the treatment of the tailings and dumps. First Party will discharge the duties of this office to the best of his ability, always devoting to same his earnest efforts and as much time as may seem necessary or essential.

"It is assumed that the treatment of the said tailings and dumps will require a period of approximately four years, and it is intended that the engagement of First Party as Manager of these operations shall cover approximately this period of time, but since it is recognized by both parties that conditions may arise which would make it desirable to terminate this employment, option is hereby given to either party to terminate said employment upon giving the other party thirty days notice of intention to do so, and in the event that First Party's employment is terminated any time during the first year subsequent to the date of this agreement he shall in addition to the Five per cent (5%) interest specified in the first paragraph of this Article be entitled to receive from Second Party as a liquidated consideration either the sum of Twelve Thousand Dollars ($12,000.00) or at option of First Party an additional Five per cent (5%) non-assessible interest in all of the Congress property acquired or to be acquired by Second Party similar in all respects to the five per cent (5%) interest hereinabove mentioned. In the event that said employment is terminated during the second year First Party shall receive in like manner either the sum of Eight Thousand Dollars ($8,000.00) or a 5% interest as above and in the event that said employment is terminated during the third year First Party shall receive in like manner either the sum of Three Thousand Dollars ($3,000.00) or a 5% interest as above.

"It is understood that the terms above anticipated shall apply whether such resignation as Manager is tendered voluntarily by First Party or at the request of the proper officials of Second Party or of the Company which may succeed to the rights of Second Party in respect to the Congress tailings and dumps and/or other property at the Congress Mine, but in the event that death or disability of First Party render the continuance of such an arrangement impossible neither First Party nor his Estate shall be entitled to any further compensation beyond the earned salary and the 5% interest stipulated in the first paragraph of this Article."

Article 6: "Nothing in this agreement contained shall be deemed to bind Second Party either to acquire any of the property herein mentioned or thereafter to develop and exploit the same, or to continue to develop the same, it being intended that Second Party shall

at its own sole discretion acquire, develop, and/or exploit any of said property or refrain from doing so as it sees fit."

In the same unreported case of *Colvocoresses v. Wasserman Co.*, already referred to, after a thorough analysis of the contract declared on and the prior contracts attached to the declaration, and on which the plaintiff's rights necessarily depended, speaking through Layton, C. J., we, in substance, said:

1. That the Congress contract primarily contemplated a sale of that property to Clark, and not a lease of it, or a right to work it on a royalty basis, on the payment of $6,000 on account of the purchase price. There were royalty provisions in it, but they were merely intended to cover depletions in the value of the property caused by working it prior to the payment of the agreed purchase price.

2. The primary scheme of the Reid contract was to provide for a transfer to the plaintiff of title to the mill tailings and mine dumps, with the right to work and treat them for ten years. But Reid never had nor could get title to any part of the property until he had paid the $20,000 purchase price, provided for by the Congress property, and an additional $5,200 to Clark, his assignor. He, therefore, could convey no greater rights to the plaintiff.

The plaintiff was not compelled to pay these sums of money, nor directly to pay any royalties, but as the Reid contract was subordinate to the Congress contract, which provided for royalty payments, it was agreed that if the plaintiff was obliged to pay royalties, Reid would promptly reimburse him for those payments. The plaintiff paid the $6,000 provided for, and thereby became entitled to a conveyance of the mill tailings and mine dumps, but only if and when Reid fulfilled his obligations, as assignee of Clark.

3. The defendant, also, paid the $6,000 provided for by his contract with the plaintiff, but he merely acquired an

option to exploit the mill tailings and mine dumps on the Congress property for a limited period. He had the right to pay the whole purchase price, and to acquire absolute title to that property, but until he did so the plaintiff could not recover the liquidated sum of $12,000 referred to in that contract, though he notified the defendant that he elected to accept that sum.

As was further pointed out in the case above referred to, the parties to the agreements, with exception. of Byrne, Trustee, seem to have engaged in a speculative venture. Clark, if Reid carried the contract through, would be paid an attorney fee of $500 and the additional sum of $5,200. If Colvocoresses saw it through, Reid would obtain, at least, a 15 per cent. interest in the Congress property, and was, also, relieved from any obligation either to Clark or to Byrne. If the defendant saw the contract through, Colvocoresses, the plaintiff, certainly obtained an interest in the mill tailings and mine dumps, employment as Manager, or if his employment should be terminated, a further interest in the property, or at his election, $12,000.

When the nature of the right acquired by the defendant, by the exercise of the option is examined in the light of the prior contracts, from which it is derived, it is apparent that, though the right was paid for, it was worthless, except for a limited period, unless the defendant took upon itself to make good the obligations of Clark and Reid.

If these obligations should not be assumed and fulfilled, then the defendant's absolute right to work the tailings and dumps was limited to June 4th, 1935, and whatever machinery and equipment was placed on the property and whatever money had been paid was subject to forfeiture.

From the general scheme of these various contracts, which compose a part of the amended second count of the plaintiff's declaration, it is, therefore, apparent that the

word "acquire," used in the contract declared on, was intended to have its usual and ordinary meaning so that meaning could not be affected by any alleged local usage relating thereto. Because of that fact, the demurrer is sustained.